*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0302p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

MARCUS FRANKLIN (03-2439); JAMAAL CLARKE
(03-2440),

        *Defendants-Appellants.*

Nos. 03-2439/2440

>

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 02-90037—Marianne O. Battani, District Judge.

Argued: March 16, 2005

Decided and Filed: July 19, 2005

Before: DAUGHTREY and CLAY, Circuit Judges; SCHWARZER, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Douglas R. Mullkoff, Ann Arbor, Michigan, Mark H. Magidson, Detroit, Michigan, for Appellants. Sarah Resnick Cohen, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Douglas R. Mullkoff, Ann Arbor, Michigan, Mark H. Magidson, Detroit, Michigan, for Appellants. Sarah Resnick Cohen, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

CLAY, Circuit Judge. In these consolidated cases, we consider the appeals of two defendants who were convicted after a jury trial. Defendant Marcus Franklin appeals his convictions for attempted bank larceny, 18 U.S.C. § 2113(a); bank larceny, *id.* § 2113(b); conspiracy to commit bank robbery, 18 U.S.C. §§ 371, 2113(a); bank robbery, *id.* § 2113(a); and brandishing a firearm during and in relation to a crime of violence, *id.* § 924(c)(1)(A)(ii). Defendant Jamaal Clarke appeals his convictions on charges of conspiracy to commit bank robbery, 18 U.S.C. §§ 371, 2113(a); bank robbery *id.* § 2113(a); and brandishing a firearm during and in relation to a crime of

---

[*] The Honorable William W Schwarzer, United States District Judge for the Northern District of California, sitting by designation.

violence, *id*. § 924(c)(1)(A)(ii).  A jury found the co-defendants guilty after a joint 10-day trial in July 2003.  Clarke presents numerous claims of error, including the erroneous admission of hearsay testimony, sufficiency of the evidence, and ineffective assistance of counsel.  Franklin claims that the admission of certain hearsay testimony violated his rights under the confrontation clause of the Sixth Amendment.  Both defendants seek re-sentencing on the ground that their sentences were determined in a manner that violated the Sixth Amendment.  We affirm the defendants' convictions but remand for re-sentencing.

## I. BACKGROUND

From December 1998 to December 1999, Marcus Franklin worked for Guardian Armored Services, an operator of ATM machines and armored trucks in Detroit, Michigan.  While at Guardian, Franklin serviced ATM machines, which necessitated that he carry a special computerized key (the "F Key").  To open an ATM machine for servicing, Franklin would use the F Key and simultaneously enter a code.  The F Key is necessary, but not sufficient, to access the cash inside an ATM; to accomplish that feat, one requires both an F Key and a "top hat" or "hatch" key.  Franklin's duties did not involve the cash inside machines and consequently he possessed only an F Key.

At the end of 1999, Franklin entered the Detroit Police Academy and resigned his post at Guardian.  However, Franklin did not return his F Key to Guardian.  Soon after beginning at the academy, Franklin procured a hatch key from Wallace Stinson, a Guardian employee with whom Franklin had worked.  In exchange for the key, Franklin promised Stinson a share in the proceeds of ATM robberies he was then contemplating.  Franklin recruited another Guardian employee, Christopher Martin, to assist in the commission of the robberies. On the night of February 27, 2000, and into the morning of February 28, Franklin, masked and armed with a gun, robbed two ATM machines in the city of Detroit, netting $100,000.  Franklin's attempt to rob a third ATM machine failed.  Martin drove Franklin to the various machines.  These crimes resulted in two charges of bank larceny and one charge of attempted bank larceny against Franklin.

The ATM robberies went unsolved.  Meanwhile, Franklin graduated from the police academy and, in May 2000, joined the Detroit Police Department's 9th precinct.  Around this time, according to Stinson's trial testimony, Franklin proposed that the two rob an armored truck.  Stinson and Franklin devised what they believed was an ideal truck robbery.  Every Monday, late at night, Guardian truck number 106 serviced an ATM at the NABI Biomedical Center in Southgate, Michigan.  Through surveillance, the two determined that the ATM was in a secluded area.  Moreover, Stinson knew that the truck typically carried $1 million.  Stinson obtained keys to open the truck's doors and its currency storage area.  Defendant Clarke agreed to assist Stinson and Franklin and on the evening of September 11, 2000, the three – armed and wearing masks – proceeded to the location of the ATM machine.  After midnight, truck 106 arrived.  In it were Timothy Leake, the driver; Effram Coleman, the "balancer," who services the ATM machines; and Julie Campbell, the guard who protects the balancer.

Leake parked the truck in a driveway near the entrance to the building containing the ATM machine.  After Coleman and Campbell entered the building, Franklin opened the driver's side door of the truck and, with a gun pointed at Leake's head, ordered Leake to move to the passenger's side.  Franklin then drove the truck to a more secluded spot where Franklin and Clarke ordered Leake to open the cargo area of the truck.  At some point thereafter, Clarke hit Leake over the head with a gun.  Next, Franklin and Clarke locked Leake in the cage area of the truck as they gathered approximately $754,968 in cash.  At trial, Leake testified that he witnessed another individual waiting for Franklin and Clarke in a getaway car.  After the robbery was complete, Franklin called Stinson, leaving a message for him to return the call.  On the morning of September 12, Stinson reached Franklin by phone; Franklin instructed him to come to Franklin's apartment, which Stinson

did.  According to Stinson's trial testimony, Franklin explained that he and Clarke had just completed the truck robbery; Franklin then gave Stinson $100,000, stored in garbage bags.

On February 28, 2000, the police arrested Christopher Martin for driving without a license. Under questioning by the Detroit Police and the FBI, Martin denied knowledge of or involvement in the previous night's ATM robberies. Ultimately, Martin admitted his involvement and agreed to cooperate in the FBI's investigation of the ATM robberies and the robbery of the armored truck. On September 12, 2000, Stinson rented a storage unit in which he deposited his $100,000 share from the truck robbery. On September 13, 2000, FBI agents executed a search warrant on the storage area and discovered the money. Some two weeks later, in an interview with FBI agents, Stinson implicated Franklin in the robberies and agreed to cooperate with the FBI. The FBI reviewed phone records and identified several calls between Franklin, Clarke and Stinson; soon thereafter, agents executed search warrants at Franklin's Detroit apartment and at his mother's home in Dearborn, Michigan. The agents also searched Franklin's car. The searches uncovered two handguns, a rifle, boxes of ammunition, magazines for the handguns, a bullet proof vest, sheets of paper on which Stinson and Clarke's names and phone numbers were written, collection letters from Franklin's creditors, a list indicating an intent to pay for various new high-priced items (e.g., a car, furniture and a TV set) in cash, and other items.

Martin and Stinson ultimately pled guilty and testified against Franklin and Clarke at trial. The jury convicted Franklin and Clarke on all of the charges against them. The district court sentenced Franklin to 97 months of imprisonment on his convictions for bank robbery, attempted bank larceny, and bank larceny; to 60 months on his conviction for conspiracy to commit bank robbery, to run concurrently with the 97 month sentence; and to a mandatory consecutive term of 7 years on his conviction for brandishing a firearm, *see* 18 U.S.C. §924(c)(1)(A)(ii). The court sentenced Clarke to 60 months of imprisonment on his conviction for conspiracy to commit bank robbery; to 70 months for his conviction for bank robbery, to run concurrently with the 60 month sentence; and to a mandatory consecutive term of 7 years on his conviction for brandishing a firearm. The court also sentenced Franklin and Clarke to 3 years each of supervised release on all charges, to be served concurrently. Finally, the court ordered Clarke to pay $653,790 in restitution and Franklin to pay $755,500.

## II.  DISCUSSION

### A.      Franklin's Confrontation Claim

Franklin contends his conviction must be reversed on the ground that the district court admitted as evidence against him the testimony of Walter Wright regarding the out-of-court statements Franklin's non-testifying co-defendant, Clarke, made to Wright. According to Franklin, the admission of this testimony abridged his Sixth Amendment right to confront the witnesses against him. We review this claim *de novo*, *see United States v. Robinson*, 389 F.3d 582, 592 (6th Cir. 2004); *United States v. McCleskey*, 228 F.3d 640, 643-45 (6th Cir. 2000), and affirm.

Walter Wright, a longtime friend of Jamaal Clarke (Wright testified that he had known Clarke for 15 years), testified before the grand jury and later at trial. Wright recounted out-of-court statements made to him by Clarke; these statements inculpated Franklin. Wright's grand jury testimony, which was reluctant, centered on a conversation Wright and Clarke had a short time after the truck robbery. Wright testified that a few weeks after the robbery, he noticed Clarke acting "paranoid" and "stressed out." This concerned Wright and he asked his friend what was on his mind. According to Wright's grand jury testimony, Clarke then confided in Wright that he was afraid the "feds" had him under surveillance because "we hit a truck." J.A. 685-87. Wright then explained that Clarke had referred to Franklin during the conversation:

| QUESTION: | Did [Clarke] ever mention at any time who did it with him either by name or the job that they had or anything like that? |
|---|---|
| ANSWER: | After awhile.  I mean one other guy came up[,] Mark.  That's what he called him and that's, I mean that's what I knew him by.  He was supposed to be a police officer and he was the one that was questioned or something and lost his job over it. |

Wright then testified that Franklin had approached Clarke for money after the robbery:

| QUESTION: | What did Jamaal tell you Marcus wanted? |
|---|---|
| ANSWER: | Some money. |
| QUESTION: | What specifically did Jamaal say? |
| ANSWER: | I think he may have told [Franklin] that he didn't have anything, something like that.  You know, "ain't no more," or "I don't have any money for you." |
| QUESTION: | Did Marcus tell Jamaal why he was coming to Jamaal for the money? |
| ANSWER: | Something about he was being watched.  He couldn't go to his money so he needed some of Jamaal's money. |

J.A. 108-111 (Transcript of Evidentiary Hearing, quoting Wright's Grand Jury testimony).

The government disclosed Wright's grand jury testimony to Franklin, withholding Wright's name.  Franklin filed a motion *in limine* to preclude Wright from testifying against Franklin at trial.  Two evidentiary hearings ensued.  At the first, on April 21, 2003, Wright testified that the FBI had coerced him into falsely testifying before the grand jury.  Because this testimony amounted to an admission of perjury and because Wright had appeared at the evidentiary hearing without counsel, the district judge adjourned the hearing and appointed counsel to represent Wright.  At the second evidentiary hearing, on April 28, 2003, Wright, now represented by counsel, recanted his claim that he had lied before the grand jury.  The government lawyer reviewed Wright's grand jury testimony and Wright simultaneously maintained that he did not have recollection of it but that, "to the best of [his] knowledge," the testimony was true and accurate.

However, Wright further testified that he had been drunk during the pertinent conversations with Clarke as well has during his grand jury testimony.  Wright also testified that he has a drinking problem and had been drinking before coming to the evidentiary hearings; that Clarke frequently lied to him, mainly due to inebriation; that his memory was unreliable because he was an alcoholic; and that he "never testified [at the grand jury] that somebody named Mark did no job."  J.A. 120, 127-28.  Despite testifying that his grand jury testimony was true to the best of his recollection, Wright also testified, "I can't be sure about it."  J.A. 119.

Over the defense's objections, Wright testified at trial.  The government strenuously denied defense suggestions that it had knowingly called an inebriated witness to testify before the grand jury.  The district court determined that Wright's grand jury testimony regarding his conversations with Clarke had a "particularized guarantee of trustworthiness."  Specifically, the court found that at the evidentiary hearings, Wright "did everything he could to retract the grand jury testimony that he gave in this case."  J.A. 139.  The court questioned whether Wright had really been drunk before the grand jury and concluded that, "[t]here seems to be no reason to believe that . . . Wright was

lying.  He testified before the grand jury that he lied before for his friend but he said he was not lying at that time.  And if he lied before for his friend, why would he lie and implicate his friend in a robbery.  That makes absolutely no sense.  Therefore, considering all of these factors, the Court finds that there is a particular guarantee of trustworthiness to the statement and the statement is allowed."[1]  J.A. 140-41.  At trial, the government read into the record Wright's grand jury testimony regarding the statements Clarke made to him.  Wright distanced himself from certain aspects of his grand jury testimony but did not deny that he believed it was true and accurate at the time he appeared before the grand jury.

Franklin submits that under the Supreme Court's recent decision in *Crawford v. Washington*, 541 U.S. 36 (2004), the admission of Clarke's statements to Wright violated the confrontation clause of the Sixth Amendment.  The government argues that *Crawford* does not apply because Clarke's statements to Wright were not testimonial.  *See Crawford*, 541 U.S. at 51.  Furthermore, according to the government, Clarke's statements were against his penal interest and because he was unavailable to testify (Clarke naturally invoked his Fifth Amendment privilege against self-incrimination), the statements were admissible under a firmly rooted exception to the hearsay rule.  The government is correct that Clarke's statements to Wright were not testimonial within the meaning of *Crawford*; if the statements had been testimonial, they would have been inadmissible absent a prior opportunity to cross examine Clarke.  *Crawford*, 541 U.S. at 67-69.  We do not agree with the government, however, that the statement against penal interest exception to the hearsay rule is firmly rooted.  Nevertheless, because Clarke's statements to Wright bear particularized guarantees of trustworthiness, it was not error to admit them.

In *Crawford*, the Supreme Court re-framed the purpose and scope of the confrontation clause.  The Court determined that the clause's predominant objective – perhaps its *only* objective – is preventing the admission of testimonial statements against criminal defendants who never had an opportunity to cross examine the declarant.  541 U.S. at 69-70.  The Court declined to "spell out a comprehensive definition of 'testimonial'" but held that the class of testimonial statements included, "at a minimum, . . . prior testimony at a preliminary hearing, before a grand jury, or at a former trial; [and] police interrogations."  *Id*. at 68.  After *Crawford*, there is "an absolute bar to statements that are testimonial, absent a prior opportunity to cross examine."  *Id*. at 61.  Indeed, the Court summed up its holding in these words: "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation."  *Id*. at 68-69.

Thus, the threshold question in this case is whether Clarke's statements to Wright were testimonial.  It is clear that they were not.  Clarke made the statements to his friend by happenstance; Wright was not a police officer or a government informant seeking to elicit the statements to further a prosecution against Clarke or Franklin.  To the contrary, Wright was privy to Clarke's statements only as his friend and confidant.  As *Crawford* itself indicates, and as we and other courts have held in the wake of *Crawford*, statements of this sort are not testimonial for purposes of the confrontation clause.  *See Crawford*, 541 U.S. at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."); *United States v. Gibson*, 409 F.3d 325, 338 (6th Cir. 2005) (describing statements as nontestimonial where the "statements were not made to the police or in the course of an official investigation . . . [nor in an attempt] to curry favor or shift the blame . . . ."); *United States v. Manfre*, 368 F.3d 832, 838 n.1 (8th Cir. 2004) ("Mr. Rush's comments were made to loved ones or acquaintances and are not the kind of memorialized, judicial-process-created evidence of which

---

[1] During Wright's grand jury testimony, the foreperson asked whether he had lied for Clarke in the past.  Wright responded in the affirmative.  The foreperson then asked whether he was then lying, i.e., before the grand jury.  Wright responded that he was not.  The foreperson asked if he was sure that he was not lying.  Wright responded: "I'm positive."  J.A. 694.

*Crawford* speaks."); *United States v. Lee*, 374 F.3d 637, 645 (8th Cir. 2004) ("Kehoe's statements to his mother do not implicate the core concerns of the confrontation clause."); *United States v. Saget*, 377 F.3d 223, 229 (2d Cir. 2004) ("Thus, we conclude that a declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of *Crawford*.").[2]

Although Clarke's statements to Wright were not testimonial, their admission into evidence may nevertheless implicate Franklin's right of confrontation.[3]  To be sure, the absolute bar of *Crawford* is not triggered under these circumstances.  However, as the Second Circuit has recently observed, the Supreme Court did not explicitly overrule its prior confrontation clause jurisprudence with its holding in *Crawford*.  *See United States v. Saget*, 377 F.3d 223, 227 (2d Cir. 2004).  Prior to *Crawford*, the admissibility of any statement – whether testimonial or not – depended on whether the statement fell under a "firmly rooted hearsay exception or [bore] particularized guarantees of trustworthiness." *Crawford*, 541 U.S. at 60 (citation and internal quotation marks omitted); *see Ohio v. Roberts*, 448 U.S. 56 (1980); *Lilly v. Virginia*, 527 U.S. 116 (1999) (plurality opinion).  Thus, "[a]ny out-of-court statement was constitutionally admissible so long as it fell within an exception to the hearsay rule or, if that exception was not firmly rooted, the court found that the statement was likely to be reliable." *Saget*, 377 F.3d at 226 (citation omitted).  The leading case standing for this generalized approach to analyzing Sixth Amendment challenges to hearsay evidence is *Ohio v. Roberts*, 448 U.S. 56 (1980), which the Court frankly ridiculed in *Crawford* but did not quite over-rule.  *See Crawford*, 541 U.S. at 61 (describing pre-*Crawford* confrontation clause jurisprudence as in "doubt" but not definitively overruled).  Consequently, with respect to non-testimonial hearsay statements, *Roberts* and its progeny remain the controlling precedents.  As we put it in the recent case of *United States v. Gibson*, "*Crawford* dealt only with testimonial statements and did not disturb the rule that nontestimonial statements are constitutionally admissible if they bear independent guarantees of trustworthiness."  409 F.3d at 338; *see also Saget*, 377 F.3d at 227 ("*Crawford* leaves the *Roberts* approach untouched with respect to nontestimonial statements . . . . Accordingly, while the continued viability of *Roberts* with respect to nontestimonial statements is in doubt, we will assume for purposes of this opinion that its reliability analysis continues to apply to control nontestimonial hearsay . . . .").

Initially, we must determine whether Clarke's statements to Wright fall within an exception to the hearsay rule.  *See Roberts*, 448 U.S. at 66.  The government contends that the statements were statements against Clarke's penal interest.  *See* FED. R. EVID. 804(b)(3).  The government is correct if, at the time Clarke made the statements, they "so far tended to subject [Clarke] to civil or criminal liability . . . that a reasonable person in [Clarke's] position would not have made [the statements] unless believing [them] to be true." *Id.*  Under the statement-against-penal-interest exception to the hearsay rule, such a statement is admissible if (1) the declarant is unavailable to testify; (2) the statement inculpates the declarant; and (3) "corroborating circumstances truly establish the trustworthiness of the statement." *United States v. Tocco*, 200 F.3d 401, 415 (6th Cir. 2000) (citing *United States v. Maliszewski*, 161 F.3d 992, 1009 (6th Cir. 1998), *cert. denied*, 524 U.S. 1184

---

[2] These cases do not conflict with our holding in *United States v. Cromer*, 389 F.3d 662 (6th Cir. 2004), that statements made by a confidential informant to the police are testimonial under *Crawford*.  Because the informant in *Cromer* inculpated the defendant in statements to the police, the informant's statements were akin to statements elicited during police interrogation, i.e., the informant could reasonably anticipate that the statements would be used to prosecute the defendant.  As the Supreme Court observed in *Crawford*, "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."  541 U.S. at 51.

[3] The government does not dispute that it offered Clarke's out-of-court statements to Wright to prove the matter asserted in the statements, i.e., that "Mark" had approached Clarke seeking money because his own stash was under FBI surveillance.  Accordingly, the statements were hearsay.  *See* FED. R. EVID. 803.

(1999)); *see also United States v. Price*, 134 F.3d 340, 347 (6th Cir.), *cert. denied*, 525 U.S. 845 (1998).  In the present case, it is clear that Clarke was unavailable to testify; at trial, he elected not to testify pursuant to his Fifth Amendment privilege against self-incrimination.  It is also clear that the statements he made to Wright inculpated him; Clarke referred to "hitting a truck" and to having money as a result.  Franklin does not dispute that these two requirements are met.  He focuses his attack on the third requirement.  It is with respect to this requirement that the demands of the confrontation clause supplant those of the rules of evidence.

To determine whether a statement is sufficiently trustworthy for admission under Rule 804(b)(3), the court is not to focus on whether other evidence in the case corroborates what the statement asserts, but rather on whether there are "corroborating circumstances which clearly indicate the trustworthiness of the statement itself." *Price*, 134 F.3d at 348 (quotation omitted).  Similarly, under *Roberts* and its progeny, a co-defendant's self-inculpatory statement that also inculpates the defendant will satisfy the admissibility standards of the confrontation clause only if the statement fits within a firmly rooted hearsay exception or otherwise bears particularized guarantees of trustworthiness. *See Roberts*, 448 U.S. at 65; *see also Lilly v. Virginia*, 527 U.S. 116, 124-25 (1999) (plurality opinion); *White v. Illinois*, 502 U.S. 346, 346-48 (1992) (plurality opinion).  The government contends that in the Sixth Circuit, the statement-against-penal-interest exception to the hearsay rule is firmly rooted for purposes of the confrontation clause. *See Neuman v. Rivers*, 125 F.3d 315, 319 (6th Cir. 1997); *Gilliam v. Mitchell*, 179 F.3d 990, 993-95 (6th Cir. 1999).  However, in *Neuman* – the one case where this Court suggested as much – the statements at issue were made by the defendant and inculpated only himself. *See Neuman*, 125 F.3d at 319-20.  In *Gilliam*, this Court declined to hold that statements against the declarant's penal interest are admissible *per se*; instead, the Court assessed whether the particular statements at issue bore particularized guarantees of trustworthiness. *See Gilliam*, 179 F.3d at 994-95. *See also Hill v. Hofbauer*, 337 F.3d 706, 717 n.5 (6th Cir. 2003) (observing that *Neuman* involved a statement made by, and inculpating only, the defendant, and that *Gilliam* declined to ensconce the statement-against-penal-interest exception to the hearsay rule among those that are firmly rooted).  Thus, it is by no means clear that Clarke's statements are admissible under a firmly rooted hearsay exception.

Under *Roberts* and its progeny, if hearsay statements do not fit within a firmly rooted hearsay exception, they are nevertheless admissible if they bear particularized guarantees of trustworthiness. *Roberts*, 448 U.S. at 65; *see also Crawford*, 541 U.S. at 60; *Lilly*, 527 U.S. at 124-25; *White*, 502 U.S. at 346-48; *Gibson*, 409 F.3d at 337-38.  Clarke's statements to Wright bear such guarantees and are therefore admissible.[4]  First, Clarke made the self-inculpatory statements not to investigators but to his close friend.  Consequently, to the extent the statements inculpated Franklin, there is no basis to conclude that Clarke intentionally did so to curry favor with law enforcement.  Further, the context of Clarke's admissions to Wright was not that of puffing or bragging; rather, as Wright has consistently testified, Clarke was behaving "paranoid" and appeared "stressed out" when Wright asked him what was on his mind.  In contrast to cases in which a declarant confesses to law enforcement but additionally implicates his accomplice in the crime, this case involves statements the declarant (Clarke) made in confidential exchanges with a long-time friend – a friend he had no reason to conclude would reveal those statements to law enforcement.  Moreover, in his statements to Wright, Clarke did not minimize his role in the robbery; the most plausible conclusion to draw from the content of the statements is that Clarke and Franklin each played substantial roles in the commission of the offense.  As we recently reiterated, the admission into evidence of statements such as these does not offend the confrontation clause. *Gibson*, 409 F.3d at 338. *Compare Lilly*, 527 U.S. at 131 (holding that a statement inculpating the declarant and his alleged accomplices is

---

[4] The district court erred to the extent it examined the trustworthiness of the statements *Wright* made *about* Clarke's statements to him.  The statements that must bear particularized guarantees of trustworthiness are the hearsay statements themselves.

not trustworthy when made as part of a custodial confession to law enforcement agents) *and Lee v. Illinois*, 476 U.S. 530, 541 (1986) (same) *with Tocco*, 200 F.3d at 416 (6th Cir. 2000) ("We find that the circumstances surrounding Polizzi's statements in this case indicate that the statements were trustworthy, particularly in light of the fact that Polizzi's statements were made to his son in confidence, rather than to the police or to any other authority for the purpose of shifting the blame to Tocco."). Accordingly, we conclude that Clarke's statements to Wright – which inculpated both Clarke and Franklin – bear particularized guarantees of trustworthiness and are therefore admissible under the confrontation clause of the Sixth Amendment as statements against the declarant's penal interest. *See also United States v. Manfre*, 368 F.3d 832, 842 (8th Cir. 2004) (sustaining the admission of a statement made "casually to an intimate confidante in a setting that does not raise the same concerns as" statements made to police officers under an incentive to curry their favor); *United States v. Saget*, 377 F.3d 223, 230 (2d Cir. 2004) (sustaining the admission of statements made by the declarant to someone he thought was his friend and confidant but turned out to be a confidential informant) (discussing the similar case of *United States v. Matthews*, 20 F.3d 538, 545 (2d Cir. 1994)).

Franklin finally submits that even in light of the circumstances tending to support a finding of trustworthiness, this Court should find error because Clarke and Wright were drunk when the pertinent conversations occurred and Wright was drunk when he first recounted the statements before the grand jury. This argument is not persuasive. First, Franklin offers no proof that Clarke and Wright were in fact intoxicated at the time the conversations occurred, let alone to such an extent that the statements should have been excluded as untrustworthy.[5] Similarly, Franklin offers no proof that Wright was intoxicated during his grand jury testimony. In any event, Wright first raised the issue of his intoxication, and Clarke's, at the first evidentiary hearing before the district court – the first time he was confronted with the reality that Clarke, his close friend, was soon to be tried for a serious crime. He never mentioned the issue during his very reluctant grand jury testimony. To the contrary, under questioning from the foreman of the grand jury, Wright was adamant that his testimony had been truthful. The district judge – whose credibility determinations must be credited where not clearly erroneous – concluded that Wright likely claimed his intoxication in order to protect Clarke. Absent *any* evidence that Wright had a motive to inculpate his friend (or to inculpate Franklin), and absent any evidence that Clarke had a motive to inculpate Franklin at the time he made the statements to Wright, there is no basis for us to conclude that the district court clearly erred.

## B.   Clarke's Claims

Clarke challenges his conviction on a number of grounds, ranging from alleged evidentiary errors to ineffective assistance of counsel. We consider each claim in turn.

### 1.   Alleged Evidentiary Errors

Clarke first contends that two of the district court's evidentiary rulings warrant reversal. We review these rulings for abuse of discretion, *e.g.*, *United States v. Wright*, 343 F.3d 849, 865 (6th Cir. 2003); *United States v. Jackson-Randolph*, 282 F.3d 369, 375 (6th Cir. 2002), and find no basis for reversal.

Clarke's first contention – that the district court should have excluded Walter Wright's testimony on the ground that Wright claimed he was intoxicated at trial and before the grand jury – is clearly without merit. Rule 602 of the Federal Rules of Evidence requires that witnesses have personal knowledge of the matter about which they testify. FED. R. EVID. 602. The threshold for

---

[5] At trial, FBI Agent Booth, who was present for Wright's grand jury appearance, testified that he noticed no signs that Wright was intoxicated.

admitting testimony under Rule 602 is "low." *United States v. Hickey*, 917 F.2d 901, 904 (6th Cir. 1990). "Testimony should not be excluded for lack of personal knowledge unless no reasonable juror could believe that the witness had the ability and opportunity to perceive the event that he testifies about." *Id*. (citation omitted). Under this standard, it was not an abuse of discretion to admit Wright's testimony. First, no record evidence corroborates Wright's claim that he was intoxicated during his grand jury and trial testimony. Moreover, he first made this claim after testifying before the grand jury, where he had steadfastly described his testimony as truthful under questioning from the foreman. The district court's decision not to credit Wright's *post hoc* representations was not clear error. In addition, Wright did not assert that conversations with Clarke regarding the robbery never occurred; rather, he primarily suggested that he could not remember precisely *when* those conversations occurred or precisely what Clarke said. In sum, the government met its low threshold of proof and Wright's testimony was admissible.

Clarke's second evidentiary claim is that the district court abused its discretion in permitting Wallace Stinson to testify regarding out-of-court statements Marcus Franklin, Clarke's non-testifying co-defendant, made to him the day after the truck robbery. Finding no abuse of discretion, we reject this claim as well. According to Stinson's testimony, Franklin made statements to Stinson in which he inculpated both himself and Clarke. Franklin did not testify at trial, electing to invoke his Fifth Amendment privilege against self-incrimination. The government contends that the admission of Franklin's out-of-court statements was proper either because they were statements between co-conspirators made in furtherance of the conspiracy, FED. R. EVID. 801(d)(2)(E), or because they were statements against Franklin's penal interest, FED. R. EVID. 804(b)(3). The district court did not specifically explain why it admitted the statements. In any event, we conclude that the statements were admissible as statements between co-conspirators made in furtherance of the conspiracy and therefore affirm the district court's ruling. Because we hold that the statements were admissible under Rule 801(d)(2)(E), we need not consider the government's alternative theory that they were admissible under Rule 804(b)(3).

At trial, Stinson testified that from 1998 to 2000, he worked at Guardian Armored Services, where he served as a driver, guard, and balancer. One of Stinson's routes was the route that included the ATM at the NABI Center in Southgate, Michigan – route 910. When assigned to that route, Stinson used the same truck which Franklin and Clarke ultimately robbed. During his time as a balancer on route 910, Stinson came to possess an extra set of keys to the truck. Stinson did not return the extra set – which offered access to the truck's cab and its currency storage area – when he left Guardian in July or August 2000. Stinson testified that he met Franklin and Christopher Martin when he was assigned to route 907. Sometime before February 2000, according to Stinson's testimony, Franklin proposed that the two use Franklin's F Key to rob ATMs in Detroit. Stinson offered his "hatch key," which is necessary in addition to the F Key for opening the currency area of an ATM. Stinson explained that Franklin promised to "take care of [him]" in exchange for use of the hatch key. J.A. 570. Stinson's understanding was that this meant Stinson would receive some proceeds from the ATM robberies. Shortly after the robberies, Franklin summoned Stinson to his home. Franklin instructed Stinson to open the trunk of his car; Stinson did so and discovered a bag of between $5000 and $7000, which Franklin instructed him to take for himself. Franklin explained to Stinson that he and Martin had stolen around $100,000 from the ATMs.

Stinson then testified regarding the robbery of the armored truck. In April 2000, according to Stinson, Franklin proposed robbing a Guardian truck. Stinson suggested a few "secluded type stops" on various truck routes. J.A. 573-74. In particular, Stinson recommended the NABI building in Southgate, Michigan. Stinson described the advantages of robbing the truck at this location: ". . . It's a very secluded place. You have to pull the truck into the back and the balancer and guard have to walk all the way around. And also at the time it's a once-a-week stop and it's a lot of [money] on the truck at that time." J.A. 574. In the April 2000 conversation with Franklin, Stinson told Franklin that the truck stopped at the NABI stop on Mondays; further, Stinson volunteered that he

had an extra set of keys to the truck and offered them to Franklin, who accepted. Stinson told Franklin that he did not want to participate in the robbery and did not want to know about it. However, Stinson testified that he was to receive a share of the proceeds. In a subsequent conversation with Franklin, Stinson explained which key to use for which door on the Guardian truck.

Finally, Stinson testified that on the morning of September 12, 2000, he noticed upon awakening that he had received voicemail messages during the night. One of the messages was from Franklin and Stinson returned the call. Franklin told Stinson to stop by; Stinson did so and testified that when he arrived, "there was a bag of money there" for him. J.A. 579-80. Stinson asked Franklin what happened and, according to Stinson, Franklin replied as follows:

> ANSWER:     Well, he told me that he did it himself, along with Jamaal, and he described what happened. I guess he told me Jamaal hit the driver and I guess they took a long time and the driver was really, Timothy was really scared about what happened.
>
> QUESTION:   Now when you say that he told you Jamaal hit the driver, did he say where he hit the driver or with what?
>
> ANSWER:     He said he hit him in the head with a weapon.
>
> QUESTION:   And you said that Marcus Franklin said it took them a long time?
>
> ANSWER:     Meaning the people who were actually inside the building servicing the building.
>
> QUESTION:   And you said that he stated to you that the driver Timothy Leake was scared?
>
> ANSWER:     Yes.
>
> . . .
>
> QUESTION:   Anything else?
>
> ANSWER:     And he told me not to get caught.

J.A. 580-81.

Stinson further testified that Franklin explained he had thrown the truck keys into the river and buried his share of the proceeds. Regarding Stinson's share, Franklin "told [Stinson] not to get caught with it and to stash it." J.A. 582. Franklin told Stinson that it would be "a while" before the two talked again. Stinson then testified that he left Franklin's residence with the bag of money, which contained $100,000, and immediately stored it in a storage unit.

Clarke contests the admissibility of Stinson's testimony to the extent Stinson recounted Franklin's references to Clarke's involvement in the robbery. Under Rule 801 of the Federal Rules of Evidence, "[a] statement is not hearsay if [t]he statement is offered against a party and is a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." FED. R. EVID. 801(d)(2)(E). It is clear that the government offered Franklin's statements against

Clarke and that Franklin, Clarke, and Stinson were coconspirators.[6]  The question for the Court is whether Franklin's statements to Stinson on September 12, after the robbery had occurred, were made "during the course and in furtherance of the conspiracy."  FED. R. EVID. 801(d)(2)(E).  The government bears the burden of showing this by a preponderance of the evidence.  *Bourjaily v. United States*, 483 U.S. 171, 176 (1987); *see also United States v. Darwich*, 337 F.3d  645, 657 (6th Cir. 2003) (citing *United States v. Hamilton*, 689 F.2d 1262, 1268 (6th Cir. 1982), *cert. denied*, 459 U.S. 1117 (1983)).  We review the district court's determination that Franklin's statements to Stinson were made in furtherance of a conspiracy for clear error,  *United States v. Clark*, 18 F.3d 1337, 1341 (6th Cir. 1994) (citing *United States v. Gessa*, 971 F.2d 1257, 1261 (6th Cir. 1992) (*en banc*)), and its decision to admit the statements under Rule 801(d)(2)(E) for abuse of discretion. *United States v. Smith*, 320 F.3d 647, 654 (6th Cir. 2003) (citation omitted).

There is a range of statements that are deemed to be in furtherance of a conspiracy for purposes of admission under Rule 801(d)(2)(E).  This Court has "acknowledged that 'statements in furtherance of a conspiracy can take many forms,' such as keeping co-conspirators advised, or concealing aspects of the scheme.  The statement may also be 'susceptible of alternative interpretations.'" *United States v. Tocco*, 200 F.3d 401, 419 (6th Cir. 2000) (quoting *United States v. Doerr*, 886 F.2d 944, 951-52 (7th Cir. 1989)).  Moreover, this Court has adopted the Fourth and Seventh Circuits' view that "a statement may be admissible as in furtherance of a conspiracy even if not exclusively, or even primarily, made to further the conspiracy." *Tocco*, 200 F.3d at 419 (quotation marks omitted) (citing *United States v. Shores*, 33 F.3d 438, 444 (4th Cir. 1994) and *United States v. Shoffner*, 826 F.2d 619, 628 (7th Cir. 1987)).  Under these precedents, Franklin's statements to Stinson were admissible.

First, the mere fact that Franklin and Clarke had already completed the robbery when Franklin revealed Clarke's participation to Stinson is not a bar to admission.  Statements that are designed to facilitate the concealment of a conspiracy's criminal accomplishments are admissible under 801(d)(2)(E). *See United States v. Monus*, 128 F.3d 376, 393 (6th Cir. 1997); *Tocco*, 200 F.3d at 419.  Franklin's statements to Stinson, which he made only hours after the robbery and in the context of dispersing the ill-gotten proceeds, were of this sort.  He explained to Stinson what occurred during the robbery, provided Stinson his share of the proceeds, and cautioned Stinson not to get caught, adding a final proviso that the two were not likely to talk again soon.  In addition, Franklin identified Clarke as a participant.  "Statements that 'identify participants and their roles in the conspiracy' also qualify as statements made in furtherance of the conspiracy." *Monus*, 128 F.3d at 393 (quoting *Clark*, 18 F.3d at 1342 (6th Cir. 1994)).  Similarly, statements that "keep a conspirator abreast of a co-conspirator's activities" are admissible. *United States v. Rios*, 842 F.2d 868, 874 (6th Cir. 1988).  In sum, the district court did not clearly err in concluding that the statements Franklin made to Stinson were in furtherance of the conspiracy. *See Clark*, 18 F.3d at 1341 (noting that this Court reviews such determinations for clear error).  Accordingly, the district court did not abuse its discretion in admitting Stinson's testimony about the statements.[7]

---

[6] The government introduced the statements to prove the truth of the matters the statements asserted; hence, the statements are hearsay. FED. R. EVID. 801(c).  Further, the government need not charge a conspiracy for 801(d)(2)(E) to apply. *See* FED. R. EVID. 801, Advisory Committee Notes, 1974 Enactment, Note to Subdivision 801(d)(2)(E). Finally, Clarke does not contest the existence of the conspiracy, nor his, Franklin's, and Stinson's participation therein. His argument is that the particular statements at issue were not made in furtherance of the conspiracy.

[7] Clarke does not challenge the admission of Franklin's statements to Stinson on Sixth Amendment grounds. We note in any event that the coconspirator exception to the hearsay rule is firmly rooted for purposes of the confrontation clause. *Bourjaily v. United States*, 483 U.S. 171, 181-83 (1987).

## 2.        **Jury Instruction on Witness Credibility**

Clarke next contends the district court erred when it declined to adopt his proposed jury instruction regarding witness credibility. We review "jury instructions as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury." *United States v. Williams,* 952 F.2d 1504, 1512 (6th Cir.1991). "A ... refusal to deliver the requested instruction is reversible only if that instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." *Id*; *see also United States v. Gibbs*, 182 F.3d 408, 432 (6th Cir. 1999). A comparison of the jury instruction proposed by Clarke with the instruction actually given compels the conclusion that Clarke's proposed instruction was "substantially covered by the charge actually delivered to the jury." *Williams*, 952 F.2d at 1512. Clarke's proposed instruction reads as follows:

> You have heard the testimony of Walter Wright, that he is an alcoholic and was drunk during his alleged conversations with Jamaal Clarke and during each interview with the federal agents, which he testified before the grand jury and all three time including this trial and two hearings before this court.
> You have heard testimony from Wallace Stinson that he admittedly used illegal drugs one time prior to testifying in open court. You may consider alcohol and drug use in deciding the credibility of the witnesses. You are the judges of the credibility of the witnesses and you must decide what if any weight to give to alcohol use by Walter Wright and the drug use by Wallace Stinson.

J.A. 949-50. The court instructed the jury in accordance with the Sixth Circuit's Pattern Criminal Jury Instruction regarding witness credibility, as follows:

> . . . Ask yourself how believable the witnesses' testimony was in light of all the other witnesses. Was the witnesses' testimony supported or contradicted by other evidence that you found to be believable? If you believe a witness's testimony was contradicted by other evidence, remember that sometimes people forget things and that even two honest people who witness the same event may not describe it exactly the same way.
>         Also you've heard testimony that a witness may have used or abused alcohol or drugs, and you may consider this in judging the credibility of the witnesses.

J.A. 1051-52.

To the extent the two instructions differ, the difference relates only to how closely each links a witness's drug or alcohol use to his credibility. Clarke's instruction seeks to remind the jury that Wright and Stinson may have been under the influence of drugs or alcohol during their testimony, while the court's instruction, by declining to refer to Wright and Stinson by name, was appropriately more ambiguous as to whether particular witnesses should be viewed with extra scrutiny. The district court provided a more general instruction regarding the credibility of any witness whose testimony the jury heard. The jury was fully apprised during Wright and Stinson's testimony of their prior and current alleged drug or alcohol abuse. The district court's instruction properly laid out the considerations relevant to evaluating credibility and emphasized that the jury was within its power to discredit a witness's testimony on the basis of his use or abuse of alcohol or drugs. Accordingly, the district court did not err in relying on its own instruction rather than the one Clarke proposed.

### 3.        Sufficiency of the Evidence for Brandishing a Firearm

Although Clarke contends otherwise, we conclude that any rational trier of fact could have found the essential elements of brandishing a firearm during and in relation to a crime of violence, 18 U.S.C. § 924(c)(1)(A)(ii), beyond a reasonable doubt.[8]  When considering a defendant's claim that his conviction rests on insufficient evidence, this Court is to review all of the evidence in the light most favorable to the government. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  We may not question credibility determinations made and inferences drawn by the jury unless they are wholly unreasonable. *See id.*  Furthermore, where, as is the case here, the defendant failed to move for a judgment of acquittal during trial or no later than seven days after the verdict, *see* FED. R. CRIM. P. 29, "appellate review is limited to determining whether there was a manifest miscarriage of justice." *United States v. Price*, 134 F.3d 340, 350 (6th Cir.), *cert. denied*, 525 U.S. 845 (1998) (citations omitted).  "A miscarriage of justice exists only if the record is devoid of evidence pointing to guilt." *Id.*  Because this record is not devoid of evidence pointing to guilt, we hold that Clarke's conviction is supported by sufficient evidence.

The government charged that Clarke violated 18 U.S.C. § 924(c)(1)(A)(ii) under two alternative theories: first, that he did so as a principal and, second, that he did so as an aider and abettor. *See* 18 U.S.C. § 2.  A defendant may be found to have brandished a firearm under an aiding and abetting theory of liability. *United States v. Robinson*, 389 F.3d 582, 590-91 (6th Cir. 2004).  We conclude that Clarke's conviction is supported by sufficient evidence under either an aiding and abetting or principal theory of liability.

To sustain a conviction under § 924(c) for aiding and abetting:

> The government must prove that the defendant, as the accomplice, associated and participated in the use of the firearm in connection with the underlying . . . crime. The government must show that the defendant was a participant rather than merely a knowing spectator, that his presence at the scene of the crime was not surplusage, and that the crime would not have transpired without him.  This can be satisfied if the accomplice knows that the principal is armed and acts with the intent to assist or influence the commission of the underlying predicate crime.

*Rattigan v. United States*, 151 F.3d 551, 558 (6th Cir. 1998) (citations omitted); *see also United States v. Lowery*, 60 F.3d 1199, 1202 (6th Cir. 1995); *United States v. Morrow*, 977 F.2d 222, 231 (6th Cir. 1992).  One may be held liable as a principal under § 924(c)(1) if the evidence shows that he actively used or brandished a firearm during a crime of violence. *See Rattigan*, 151 F.3d at 557; *see also Bailey v. United States*, 516 U.S. 137, 143 (1995).  Clarke concedes that armed robbery is a crime of violence but contends that the evidence does not sufficiently link him to the guns allegedly used in the armed robbery at issue here.

Timothy Leake, the driver of the truck, testified that a masked individual ordered him at gunpoint to move to the passenger side of the truck.  The masked individual assumed the driver's seat and drove the truck to a secluded area, at which point he ordered Leake to exit.  When Leake did so, another individual hit him over the head "with the butt of a gun." J.A. 458-60.  That individual then ordered Leake to open the cargo area of the truck.  Wallace Stinson, a coconspirator

---

[8] The government is not required to charge in the indictment that the defendant brandished a firearm because § 924(c)(1)(A)(ii) is merely a sentencing factor, the applicability of which may be determined by the district judge. *Harris v. United States*, 536 U.S. 545, 568 (2002).  In this case, the government elected to charge Franklin and Clarke with brandishing firearms during the armed robbery.  Accordingly, the district court instructed the jury on the basic elements of §924(c) and on the brandishing factor under a principal theory and an aiding and abetting theory; the jury returned a verdict of guilty.

in the truck robbery, testified that on the morning after the robbery, Franklin told him that he and Clarke had committed the crime together.  In addition, Walter Wright admitted in his trial testimony that before the grand jury he had testified that at some point after the robbery Clarke told him that he and "Mark" had "hit a truck."  Further, Wright testified that Franklin had asked Clarke for money because he was being watched and could not access his own share.

On the basis of this testimony, the jury could have reasonably concluded that (1) the two individuals who robbed the truck were Clarke and Franklin; (2) one of the two pointed a gun at Leake and the other hit Leake over the head with the butt of a gun; and (3) Clarke knew that Franklin was armed.  Under the applicable case law, *e.g.*, *Robinson*, 389 F.3d at 590-91; *United States v. Davis*, 306 F.3d 398, 408-410 (6th Cir. 2002); *United States v. McNeil*, 2004 WL 1544486 (6th Cir. July 1, 2004) (unpublished); *United States v. Clark*, 2002 WL 1378235 (6th Cir. June 24, 2002) (unpublished), this constitutes sufficient evidence to support Clarke's conviction for brandishing a firearm during and in relation to a crime of violence, 18 U.S.C. § 924(c)(1)(A)(ii), either as a principal or as an aider and abettor.

### 4.        Ineffective Assistance of Counsel

Clarke contends that his trial counsel was constitutionally ineffective in two respects.  First, according to Clarke, counsel was ineffective by not moving to sever the trial such that Clarke, who was charged with fewer offenses than Franklin, would be tried separately.  Second, Clarke maintains that counsel's failure to seek a downward departure also amounts to ineffective assistance.   The latter claim is moot because, as we explain *infra*, both defendants must be re-sentenced.

Consistent with the Supreme Court's preference, *Massaro v. United States*, 538 U.S. 500 (2003), it is our general practice not to consider ineffective assistance claims on direct appeal because they are better left to a post-conviction motion to vacate under 28 U.S.C. § 2255.  *See United States v. Bradley*, 400 F.3d 459, 461-62 (6th Cir. 2005) (listing cases); *United States v. Shabazz*, 263 F.3d 603, 612 (6th Cir. 2001); *United States v. Neuhausser*, 241 F.3d 460, 474 (6th Cir. 2001); *United States v. Pruitt*, 156 F.3d 638, 646 (6th Cir. 1998).  However, there is a narrow exception to the general rule that ineffective assistance claims may not be considered on direct appeal – namely, "when the existing record is adequate to assess properly the merits of the claim," *Pruitt*, 156 F.3d at 646 – and Clarke contends it applies here.  We agree.  The existing record is adequate for purposes of determining whether counsel's failure to move for a severance prejudiced Clarke.

Clarke must show that his counsel's performance (1) "fell below an objective standard of reasonableness" and (2) was prejudicial, i.e., "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 693-94 (1984).  Here, Clarke maintains that it was objectively unreasonable and prejudicial to Clarke for his counsel not to seek severance.  The severance of a trial of two defendants who were jointly indicted is an extraordinary remedy, employed only to alleviate "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).  Indeed, this Court has observed that "[a] defendant seeking severance at trial from co-defendants bears a strong burden and must demonstrate substantial, undue, or compelling prejudice." *United States v. Davis*, 177 F.3d 552, 558 (6th Cir. 1999).  Clarke does not specify how the joint trial prejudiced him; therefore, we construe the claim as a general one, i.e., as a claim that Clarke alleges prejudice stemming from the spill-over effect of evidence against Franklin.

Clarke's claim must fail.  First, the evidence did not implicate Clarke in the ATM larcenies for which Franklin alone was tried.  Second, these were discrete incidents and "[j]uries are presumed to be capable of following instructions . . . regarding the sorting of evidence and the separate

consideration of multiple defendants." *United States v. Walls*, 293 F.3d 959, 966 (6th Cir. 2002) (citing *Zafiro*, 506 U.S. at 540-41). The limiting instructions provided at the commencement of the trial by the district court apprised the jurors of their responsibility to consider each defendant separately.[9] The court reminded the jurors of this obligation at the close of the evidence:

> Each defendant has been charged with separate crimes. The number of charges is no evidence of guilt, and this should also not influence your decision in any way. It is your duty to separately consider the evidence that relates to each charge, and return a separate verdict for each one . . . . And in our system of justice, guilt or innocence is personal and individual. It is your duty to separately consider the evidence against each defendant on each charge, and to return a separate verdict for each one of them. For each one, you must decide whether the government has presented proof beyond a reasonable doubt that a particular defendant is guilty of a particular charge, okay. So it's each defendant, each charge you have to separately consider. Your decision on any one defendant or charge, whether it is guilty or not guilty, should not influence your decision on the other defendant on any of the other charges.

J.A. 1055-57.

The district court continued in this manner and individually instructed the jury as to each defendant and the crimes with which each were charged. Clarke presents no evidence to rebut the presumption that these instructions adequately insured his right to a fair trial; indeed, Clarke appears to ignore the fact that the instructions were given in the first place. Consequently, we must conclude that Clarke was not prejudiced merely by virtue of being tried alongside Franklin. It follows that counsel's failure to seek severance did not prejudice Clarke. Therefore, counsel was not constitutionally ineffective. *See Strickland*, 466 U.S. at 687.

## C.     Sentencing Claims

Having found no basis to reverse the judgments of conviction against Defendants, we now turn to their argument that *United States v. Booker*, 125 S. Ct. 738 (2005) requires us to vacate their sentences and remand for re-sentencing. Reviewing for plain error, because Defendants make this argument for the first time on appeal, *e.g.*, *United States v. Oliver*, 397 F.3d 369, 377-78 (2005); *United States v. Milan*, 398 F.3d 445, 450-51 (6th Cir. 2005), we agree that a remand for re-sentencing is required.

The district court sentenced Franklin as follows. First, it arrived at a base offense level of 20 for his conviction for attempted bank robbery. *See* U.S.S.G. § 2B3.1; 18 U.S.C. § 2113(a). The court added two points because the taking of a financial institution's property was an object of the offense. *See* U.S.S.G. § 2B3.1(b)(1). Second, the court determined the base offense level for Franklin's two convictions for bank larceny, arriving at 6. *See* U.S.S.G. § 2B1.1; 18 U.S.C. § 2113(b). The district court added 8 points because the two ATM thefts resulted in more than $70,000 in proceeds. *See* U.S.S.G. § 2B1.1(b)(E)(1). Third, the court determined a base offense level of 20 for Franklin's convictions for bank robbery and conspiracy to commit bank robbery. *See* U.S.S.G. § 2B3.1; 18 U.S.C. § 2113(a). To this the court added upward adjustments for specific offense characteristics, to wit: (1) 2 points for taking the property of a financial institution, *see* § 2B3.1(b)(1); (2) 2 points for physically restraining a victim, *see* § 2B3.1(b)(4)(B); and (3) 3 points for causing at least $250,000 in loss. *Id*. § (b)(7)(D). Finally, the court determined that with respect to each of the offenses for which Franklin was convicted, a 2-point enhancement was warranted

---

[9] When the jury was first impaneled, the court instructed the jury that each defendant was "entitled to their day in court. So you have to consider each of them separately, all right?" Finally, the court emphasized that the guilt or innocence of one defendant has no bearing on the guilt or innocence of the other.

because he was an organizer, leader, or supervisor.  *See* § 3B1.1(c).  Thus, including the organizer enhancement, the final offense levels for each offense were as follows: 24 for attempted bank robbery; 16 for bank larceny; and 29 for bank robbery and conspiracy.  The court then computed the combined adjusted offense level according to the multiple count adjustment procedure provided for in U.S.S.G. § 3D1.4.  The court arrived at a combined adjusted offense level of 30.  With Franklin's criminal history category of I, this placed him in the range of 97 to 121 months under the 2002 guidelines.  The court sentenced him to 97 months, to run consecutively with the mandatory 7 year sentence for his conviction under 18 U.S.C. § 924(c)(1)(A)(ii).  On appeal, Franklin challenges only the upward adjustments.

The upward adjustments were plainly erroneous under *United States v. Oliver*, 397 F.3d 369 (6th Cir. 2005).  Solely on the basis of its own fact-finding, the district court added 2 points for physically restraining a victim during the armed robbery, 2 points for being an organizer or leader, and 3 points for causing a loss in excess of $250,000.  Having applied these adjustments, the district court concluded it was required to sentence Franklin to at least 97 months.  But the maximum offense level authorized by the jury's verdict is 26, which, because of Franklin's criminal history category of I, would support a sentence of no more than 78 months.  U.S.S.G. Sentencing Table. Since the sentence Franklin received exceeded this maximum and since the district court thought the sentence was required, Franklin's substantial rights were affected and he must be re-sentenced. *Oliver*, 397 F.3d at  380-81; *Milan*, 398 F.3d at 451-52; *United States v. McDaniel*, 398 F.3d 540 (6th Cir. 2005).  In any event, even if we did not think the upward adjustments conflicted with the Sixth Amendment as interpreted in *Booker*, we would still be required to remand Franklin's case for re-sentencing under *United States v. Barnett*, 398 F.3d 516 (6th Cir. 2005).  *Barnett* instructs us to presume that a sentencing court's failure "to treat the Sentencing Guidelines as advisory" is an error that affects the defendant's substantial rights.  398 F.3d at 527-29.  We observed in *Barnett* that in certain cases there may be evidence sufficient to rebut this presumption.  *Id.* at 529.  There is no such evidence in Franklin's case.  The district court sentenced Franklin to the minimum amount under the range that it determined was required.  Further, the court observed that he had no prior criminal history and had an impressive background.  Under *Barnett*, there is no basis to rebut the presumption that the district court's sentencing determination, which it thought was mandatory, prejudiced Franklin.

Clarke also must be re-sentenced.  The district court found a base offense level of 20 for Clarke's bank robbery and conspiracy convictions.  *See* § 2B3.1.  The court added 2 points because the property of a financial institution was taken in the robbery.  *See id.* § (b)(1).  The court then added 2 points for physically restraining a victim and 3 points because the offense resulted in at least $250,000 in loss.  *Id.* §§ (b)(4)(B), (b)(7)(B).  Consequently, Clarke's final offense level was 27, which placed him in a sentencing range of 70 to 87 months since his criminal history category was I.  The district court sentenced him to 70 months, the minimum under the range, to precede the mandatory 7 year sentence for his conviction under 18 U.S.C. § 924(c)(1)(A)(ii).  Without the upward adjustments, which were based solely on judge-found facts and which resulted in a sentencing range the judge thought was required, Clarke's sentencing range would have been 41 to 51 months.  U.S.S.G. Sentencing Table.  Clarke is entitled to re-sentencing for the same reasons that Franklin is.  Under *Booker* and *Oliver* or, alternatively, under *Barnett*, Clarke's sentence constitutes plain error and the proper remedy is a remand for re-sentencing.

## III.  CONCLUSION

For the foregoing reasons, we affirm Defendants' convictions, vacate their sentences, and remand for re-sentencing.