59 F.3d 171
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Walter Clinton VALENTINE, Jr., Defendant-Appellant.
 No. 94-6195.
 United States Court of Appeals, Sixth Circuit.
 June 30, 1995.
 
 Before: MARTIN and RYAN, Circuit Judges; and GILMORE, Senior District Judge.*
 RYAN, Circuit Judge.
 
 
 1
 The defendant, Walter Valentine, appeals from his convictions and sentence entered after a jury found him guilty of two violations of 18 U.S.C. Sec. 472: (1) possessing and concealing counterfeited currency with the intent to defraud; and (2) passing counterfeited currency with the intent to defraud. On appeal, the defendant raises three issues: (1) whether the district court erred by partially denying the defendant's request for specific government records under Brady v. Maryland; (2) whether sufficient evidence supported the guilty verdicts; and (3) whether the district court clearly erred in determining the amount of the "face value of the counterfeit items" for purposes of setting the offense level. We affirm the convictions and sentence.
 
 I.
 
 2
 From December 1992 to August 1993, Walter Valentine served as an informant for the Federal Bureau of Investigation (FBI), providing information regarding a prostitution, drug distribution, and counterfeiting ring. Valentine worked with FBI Agent Wayne Baker. During the 1980s, Valentine was an FBI informant in investigations unrelated to the 1992-93 counterfeiters. While working on the 1992-93 counterfeiting investigation, Valentine provided information regarding another, unrelated investigation. The events relevant to this case arose from the 1992-93 counterfeiting investigation.
 
 
 3
 Prior to August 1993, D & B Auto Sales, an automobile dealership in Knoxville, Tennessee, sold Valentine a $1300 Ford LTD; Valentine paid a $600 down payment, leaving a $700 balance. On August 17. 1993, the defendant left an envelope which contained $700 in counterfeit twenty dollar bills and a receipt under D & B's door. On that evening, two D & B employees, Brad Keller and Anthony Ellison, found the envelope and inspected the currency. Ellison noticed that some of the serial numbers matched those on other bills, prompting him to phone D & B's owner, Doug Boles. Keller, Ellison, and Boles drove to the defendant's house and confronted Valentine. According to the D & B employees, Valentine asserted that he had placed hundred dollar bills in the envelope and accused Keller and Ellison of switching the money. After further argument, Boles told Ellison to call the police. Valentine then drove away before the police arrived. At trial, Valentine denied ever telling Boles that he had paid in hundred dollar bills. According to the defendant, Valentine suggested that Boles call the police.
 
 
 4
 Although Valentine conceded at trial that he left the counterfeit cash, he claimed he was forced to do so. According to the defendant, a counterfeiter, Cary Scoggins, gave him the bogus money in McAllen, Texas. Valentine testified that another alleged counterfeiter and drug dealer, Jeff "Jay" Perry, ordered the defendant to use $700 of the counterfeit cash to pay the remaining balance on the Ford LTD in order to obtain the car's title. Presumably, Perry knew a Mexican drug dealer who wanted the car. Valentine testified that Perry followed the defendant to D & B on August 17 and watched the defendant leave the envelope. Valentine asserted that he delayed arriving there until after business hours, hoping to call Baker that evening and ask the agent to pick up the counterfeit bills. After leaving the money at D & B, Valentine drove around for an hour to ensure no one was following him. At trial, Valentine admitted that he had not been threatened on August 17 in Knoxville; the alleged threat was made in McAllen. The defendant also admitted that he already owned title to the Ford LTD by August 18, 1993.
 
 
 5
 Cary Scoggins testified that he never directed Valentine to use the money to pay for the Ford LTD, and that Valentine bragged about paying for the car with counterfeit money. Scoggins admitted that he gave Valentine counterfeit cash several times. First, in June or July 1993, Scoggins gave Valentine $1000 as a "sample," then an additional $9000. Later, around early August 1993, Scoggins traveled from Chattanooga to McAllen in order to do "business" in Mexico. Scoggins brought $280,000 in counterfeit cash with him to McAllen, hoping to spend it in Mexico. When Scoggins's "associates" were arrested for counterfeiting, he decided to destroy the counterfeit bills. However, Valentine asked for some of the cash, and Scoggins obliged by giving Valentine between $50,000 and $100,000. Thus, according to Scoggins, by early August 1993, he had given Valentine $60,000 to $110,000 in counterfeit cash.
 
 
 6
 Around August 13, 1993, Valentine turned over $1740 in counterfeit currency to Agent Baker; $200 worth of the bills were shredded. After the August 17 confrontation with the D & B employees, Valentine drove two hours to Chattanooga. Upon reaching Chattanooga, the defendant called Baker, who works in Knoxville, and reported the encounter. On August 18, Valentine gave Baker another $10,200 in counterfeit money.
 
 
 7
 On March 1, 1994, a federal grand jury returned a two-count indictment against the defendant. Count 1 alleged that, from the end of June 1993 to August 18, 1993, Valentine possessed and concealed counterfeit notes with the intent to defraud. Count 2 alleged that, on August 17, 1993, Valentine passed counterfeit notes at D & B with the intent to defraud. On April 28, 1994, Valentine notified the government that he intended to rely upon the defense of actual or believed exercise of public authority on behalf of the FBI. The defendant also moved for the production of "specific" Brady materials; paragraphs 4-7 of the motion requested: (4) records of all information provided by Valentine to the FBI; (5) records showing the dangerousness of all persons about whom Valentine provided information to the FBI; (6) results of a review of FBI personnel files of Wayne Baker, George Lambert, William Hendon, and Sterling Owen IV establishing Valentine's relationship with the FBI; and (7) FBI records relating to an alleged sexual relationship between Baker and Valentine's wife, Sylvie Valentine. All motions were referred to a magistrate judge.
 
 
 8
 The magistrate held that Valentine "met the threshold showing that the contents of the personnel file of Special Agent Wayne Baker may contain material evidence, ... but not as to the other individuals" listed in paragraph 6. The magistrate ordered the FBI attorney in Knoxville who handled Brady requests to review Baker's personnel file. The FBI attorney responded to the prosecutor with a report, which explained that the attorney had reviewed Baker's "main" personnel file and an "internal investigation" file regarding Baker's relationship with Sylvie Valentine. The attorney reported that five documents could arguably constitute Brady evidence: (1) an admonition letter to Baker from a personnel chief; (2) an FD-302 interview report describing a phone conversation in which Valentine complained to an FBI supervisor that Baker had sexual relations with Valentine's wife; (3) an FD-302 describing an interview with Valentine on December 14, 1993; (4) an FD-302 describing an interview with Sylvie Valentine on December 15, 1993; and (5) a sworn statement signed by Baker on December 21, 1993. The prosecutor released the FD-302s describing Valentine's complaint and interview; on June 30, 1994, the other three documents were offered to the district court for in camera inspection.
 
 
 9
 The district court, upon review of the magistrate's order, held that Valentine did "not ma[k]e an adequate showing on the record before the court that the remaining items requested (... to the extent not already provided) are necessarily exculpatory in nature." The district court ordered the release of the remaining three documents regarding Baker's relationship with Sylvie Valentine. The documents explained that the FBI found that Baker did not know that Sylvie Valentine was the defendant's wife; the defendant had introduced her as a "friend." The admonition letter explained that the FBI concluded that Baker exercised poor judgment in associating with a person to whom he was introduced by an informant.
 
 
 10
 On July 7, 1994, the jury found the defendant guilty on both counts. The district court sentenced Valentine to concurrent twelve month terms of confinement on both counts. The district court adopted the presentence report's recommendation to increase the defendant's offense level by 3 levels for $12,640 as the "face value of the counterfeit items." The defendant filed this timely appeal.
 
 II.
 A. Disclosure under Brady
 
 11
 The defendant contends that the magistrate and the district court erred by requiring the defendant to make an initial showing that the records requested in paragraphs 4-6 of its motion were "material" before ordering the government to produce those records. To repeat, paragraphs 4-6 requested: (4) unedited records of all information provided by Valentine to the FBI; (5) unedited records showing the potential for danger of all persons about whom Valentine provided information to the FBI, including results of all polygraph examinations of Cary Scoggins; and (6) results of a review of FBI personnel files of Wayne Baker, George Lambert, William Hendon, and Sterling Owen IV so as to establish Valentine's relationship with the government.
 
 
 12
 The government responds that it has produced all material evidence to the defendant, and to the extent that Valentine asks for more, he merely speculates as to the materiality of remaining evidence. First, the government explains that it turned over sixty-two documents from investigation files, which contained all the information that was in any way relevant to this prosecution. Second, the government points out that any information regarding the potential danger of investigative targets came from Valentine himself, and thus the numerous documents turned over pursuant to the paragraph 4 request included the information requested in paragraph 5. The government also explains that it released a polygraph examination of Cary Scoggins, and Scoggins's criminal record, to the defendant. Third, the government explains that it released all five documents relevant to Baker's relationship with Valentine's wife, and contends that the personnel files of the other three agents are not material to this case.
 
 
 13
 A determination of materiality under Brady presents a mixed question of law and fact, and thus is reviewed de novo. United States v. Phillip, 948 F.2d 241, 250 (6th Cir. 1991), cert. denied, 112 S. Ct. 994 (1992).
 
 
 14
 In United States v. Presser, 844 F.2d 1275 (6th Cir. 1988), we explained the contours of Brady v. Maryland, 373 U.S. 83 (1963), and concluded that Brady does not establish a general right of discovery of nonmaterial impeachment evidence. The defendants in Presser hired fictitious employees and used union funds to pay the "ghost" employees. The defendants claimed that they were cooperating in an FBI investigation, and that the FBI authorized the hiring of the fictitious employees. Before trial, the defendants requested "all" impeachment evidence against government agents who were scheduled to testify. 844 F.2d at 1277-78. In rejecting the blanket request, we explained that Brady establishes a rule of due process, not a general constitutional right of discovery. Id. at 1281 (citing United States v. Bagley, 473 U.S. 667, 675 (1985), and Weatherford v. Busey, 429 U.S. 545, 559 (1977)).
 
 That rule requires the government
 
 15
 to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment.... [A] majority of this Court has agreed, "[e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."
 
 
 16
 Pennsylvania v. Ritchie, 480 U.S. 39, 57 (1987) (citations omitted) (quoted by Presser, 844 F.2d at 1281). "[T]he government typically is the sole judge of what evidence in its possession is subject to disclosure. If it fails to comply adequately with a discovery order requiring it to disclose Brady material, it act at its own peril." Presser, 844 F.2d at 1281. Accordingly, we concluded in Presser that Brady and its progeny did not "give[] the defense a general right to pre-trial discovery of evidence impeaching defense witnesses, where the prosecution denies that any such material is exculpatory and material under Brady." Id. at 1283.
 
 
 17
 Similarly, in United States v. Driscoll, 970 F.2d 1472 (6th Cir. 1992), cert. denied, 113 S. Ct. 1056 (1993), we affirmed the district court's denial of the defendant's request for the personnel files of the defendant's arresting officers. The defendant in Driscoll contended that, contrary to the arresting officers' assertions, he was not holding a shotgun when the officers arrested him. Id. at 1475. We confirmed that the defendant did not have a right of access to the officers' personnel files by simply asserting the hope that he could find evidence to "cast doubt on their credibility." Id. at 1482. The court in Driscoll noted that the defendant "offered no support for his contention that personnel files might contain information important to his case." Id. We approvingly quoted from United States v. Andrus, 775 F.2d 825, 843 (7th Cir. 1985), for the proposition that
 
 
 18
 [m]ere speculation that a government file may contain Brady material is not sufficient to require a remand for in camera inspection, much less reversal for a new trial. A due process standard which is satisfied by mere speculation would convert Brady into a discovery device and impose an undue burden upon the district court.
 
 
 19
 Driscoll, 970 F.2d at 1482. Finally, in Driscoll, we likened the defendant's request to that in United States v. Pitt, 717 F.2d 1334, 1338-39 (11th Cir. 1983), cert. denied, 465 U.S. 1068 (1984), "which held that because a defendant had failed to demonstrate that the contents of an FBI agent's file contained material evidence, the district court did not err in refusing to order the prosecution to turn over this file." Driscoll, 970 F.2d at 1482.
 
 
 20
 We must refer to Valentine's defenses in determining whether specific evidence is "material." Valentine relies on the long-established coercion defense and the novel public authority defense. In United States v. Martin, 740 F.2d 1352, 1361 (6TH CIR. 1984), we held that the district court properly instructed the jury that the coercion defense "may provide a legal excuse for the crime charged .... [H]owever, the compulsion must be present and immediate and of such a nature to induce a well-founded fear of impending death or serious bodily injury." (Emphasis added.) In addition, the compulsion "must be in a situation in which there was no opportunity to avoid the danger." United States v. Campbell, 675 F.2d 815, 820-21 (6th Cir.), cert. denied, 459 U.S. 850 (1982).
 
 
 21
 A few circuits have explained the "public authority" defense, concluding that the label captures three versions. United States v. Burrows, 36 F.3d 875, 881-82 (9th Cir. 1994); United States v. Baptista-Rodriguez, 17 F.3d 1354, 1368 n. 18 (11th Cir. 1994); see also United States v. Holmquist, 36 F.3d 154, 161 & nn.6-7 (1st Cir.), cert. denied, 115 S. Ct. 1797 (1995).
 
 
 22
 First, the defendant may allege that he lacked criminal intent because he honestly believed he was performing the otherwise-criminal acts in cooperation with the government. "Innocent intent" is not a defense per se, but a defense strategy aimed at negating the mens rea for the crime, an essential element of the prosecution's case. ...
 
 
 23
 A second possible defense is "public authority." With this affirmative defense, the defendant seeks exoneration based on ... [his] reasonabl[e] reli[ance] on the authority of a government official to engage him in a covert activity. The validity of this defense depends upon whether the government agent in fact had the authority to empower the defendant to perform the acts in question....
 
 
 24
 A third possible defense ... is "entrapment by estoppel." This defense applies when a government official tells a defendant that certain conduct is legal and the defendant commits what would otherwise be a crime in reasonable reliance on the official's representation.
 
 
 25
 Baptista-Rodriguez, 17 F.3d at 1368 n.18 (emphasis added) (quoted by Burrows, 36 F.3d t 881-82). Although unclear, Valentine apparently relies on the first version of the public authority defense, the "innocent intent" strategy. Valentine seems to assert that he had no intent to defraud D & B because he was cooperating with the FBI in an investigation, which would be jeopardized if Valentine had not passed the notes.
 
 
 26
 We conclude that the district court did not err by refusing to order the government to turn over all the records requested in paragraphs 4-6 of the defendant's request. We note first that the magistrate, the district court, and the prosecution recognized that Brady generally obligated the government to release material information; the only dispute arose from the defendant's purportedly "specific" requests. We also note that Valentine was not requesting generally "impeaching" evidence under paragraphs 4-6, that is, evidence that would discredit the agents' propensity for telling the truth. Instead, the defendant sought to justify the sought-after records as substantively material evidence, that is, evidence that would establish his coercion and public authority defenses. With this in mind, we turn to each category of records.
 
 
 27
 First, paragraph 4 requested records of all information provided by Valentine to the FBI. The district court did not completely deny the defendant's request for these records. The government produced sixty-two documents relating to the counterfeiting investigation that the government believed to be material under Brady. Under Presser, Valentine must ordinarily rely on the government to decide what evidence meets the materiality requirement. The government asserts that it turned over all material evidence, and Valentine has not shown otherwise.
 
 
 28
 Second, paragraph 5 requested records showing the dangerousness of persons about whom Valentine provided information to the FBI. The government released a polygraph examination of Cary Scoggins. Aside from this polygraph examination, and Scoggins's criminal record, the government asserts that all records showing the dangerousness of investigative targets came from Valentine. In light of the government's contention that it released all material records documenting the information given by Valentine to the FBI from paragraph 4, the district court did not err by refusing to order the release of records showing the dangerousness of all persons on whom Valentine reported.
 
 
 29
 Third, the defendant requested in paragraph 6 "[r]esults of a review of the ... personnel files of ... Wayne Baker, George Lambert, William Hendon, and Sterling Owen IV so as to provide any information that would establish ... Valentine's ... relationship with the government." For two reasons, the district court properly denied the defendant's request as to Lambert, Hendon, and Owen. First, our decisions in Driscoll and Presser suggest that Valentine cannot force an in camera inspection of the personnel files absent some showing of materiality. Second, and most importantly, Driscoll and Presser involved a request for evidence that would discredit the officers' propensity for truth-telling. Here, Valentine purported to ask for the personnel files in hopes of finding substantive evidence, specifically, evidence showing that Valentine exercised wide discretion during the investigations. Valentine fails to explain why, outside of Baker's file, anything in the other agents' personnel files would show anything about the range of discretion granted to Valentine material to the counterfeiting investigation. Indeed, Valentine does not even explain who these agents are; we can reconstruct from trial testimony that Lambert is Baker's supervisor and Hendon is the FBI agent who used Valentine's information in 1982. The defendant leaves us guessing as to what role Agent Owen played. Finally, the government explains that personnel files merely contain records of promotions, raises, and other routine personnel matters. In sum, the defendant's contention that the personnel files contain substantive material evidence is unsupported.
 
 
 30
 Finally, in response to Valentine's request for information regarding Baker's relationship with Sylvie Valentine, the government released five documents that report internal investigation interviews and the FBI's conclusion of the matter. If the government has hidden any material evidence -- and Valentine has not identified any -- Valentine remains generally free to challenge the conviction when the evidence surfaces. Accordingly, we conclude that the district court committed no error in crafting its disclosure order.
 
 B. Sufficiency of the Evidence
 
 31
 In reviewing a claim of insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).
 
 
 32
 We conclude that a rational trier of fact could reject Valentine's defenses, and could find that Valentine intended to defraud D & B. The defendant had several opportunities to call Baker about the counterfeit notes; because Valentine waited until after D & B employees confronted him, the jury could infer that the defendant had never planned on calling Baker at all. Also, the jury could rationally credit Scoggins's testimony showing that Valentine possessed much more counterfeit money than he turned over. Finally, Valentine even delayed turning over the money that he eventually gave to Baker. Valentine had the initial $1740 for about a week; he also waited until after the confrontation to turn over the $10,200. By rationally crediting Scoggins, the jury could find that Valentine intended to defraud D & B by passing the $700 in counterfeit notes.
 
 
 33
 As for the coercion defense, the defendant conceded that Perry threatened him in McAllen, Texas. The defendant had an opportunity to avoid the danger by calling Baker. In addition, absent supporting testimony from Perry, the jury could entirely disbelieve Valentine's coercion story. Thus, the evidence sufficiently supported the convictions.
 
 C. Relevant Conduct
 
 34
 The district court's factual determination as to the "face value of the counterfeit items," USSG Sec. 2B5.1(b)(1), used to set the specific offense characteristic is reviewed for clear error, see United States v. Milligan, 17 F.3d 177, 183 (6th Cir.), cert. denied, 115 S. Ct. 211 (1994). The government must prove the specific offense characteristic by a preponderance of the evidence. United States v. Silverman, 889 F.2d 1531, 1535 (6th Cir. 1989).
 
 
 35
 Section 2B5.1 is the sentencing guideline applied to offenses for counterfeiting United States currency under 18 U.S.C. Sec. 472. Section 2B5.1(b)(1) directs the sentencing court to increase the offense level for the "face value of the counterfeit items" according to the table at Sec. 2F1.1, the "fraud and deceit" guideline. From that table we learn that the offense level should be increased by 3 levels if the face value of the counterfeit items exceeds more than $10,000, but is less than or equal to $20,000. Sec. 2F1.1(b)(1)(D). Relevant conduct must be considered in determining the "face value of the counterfeit items," including "all acts and omissions committed" by the defendant "that occurred during the commission of the offense of conviction," Sec. 1B1.3(a)(1)(A).
 
 
 36
 The defendant apparently concedes that the $700 passed to D & B was relevant conduct, but attacks the district court's inclusion of an additional $11,940 as relevant conduct. The $11,940 comprises: (1) $1,540 in counterfeit notes turned over to Baker on August 13, 1993; (2) $200 in shredded counterfeit notes turned over to Baker on August 13; and (3) $10,200 in counterfeit notes turned over to Baker on August 18. Valentine concedes that he possessed those notes for some time, but argues that he possessed the notes for a legitimate reason, that is, to assist the investigation.
 
 
 37
 We conclude that the district court properly increased the offense level by 3 for the "face value" specific offense characteristic. The government proved by a preponderance of the evidence that the defendant possessed and concealed at least $10,200 in counterfeit money with the intent to defraud. That was the amount turned over on August 18, 1993, after Valentine knew that D & B would alert the police that he passed counterfeit notes. Scoggins's testimony established that Valentine possessed the $10,200 from at least early August 1993; coupled with Valentine's intent to defraud D & B by passing the $700, the evidence shows that the possession and concealment of the $10,200 was committed during the offenses of conviction. It is less clear whether the $1740 turned over on August 13 was relevant conduct; that amount arguably was used "to avoid detection," Sec. 1B1.3(a)(1), because Valentine might have turned over small amounts to mislead Baker. However, it is unnecessary to decide whether to include the $1740; the $10,200 was surely relevant conduct, and that amount is all that is required for the 3-level increase in Sec. 2F1.1(b)(1)(D). The district court committed no clear error in finding that the "face value of the counterfeit items" was more than $10,000.
 
 III.
 
 38
 We AFFIRM the defendant's convictions and sentence.
 
 
 
 *
 The Honorable Horace W. Gilmore, Senior United States District Judge for the Eastern District of Michigan, sitting by designation