RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0170p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

GARY THEUNICK (08-1363), MAXWELL
GARNETT (08-1452), and FREDERICK
MACKINNON (08-1569),

        *Defendants-Appellants.*

Nos. 08-1363/1452/1569

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
Nos. 05-20002-001; 05-20002-003; 05-20002-002—
Robert H. Cleland, District Judge.

Argued: April 20, 2011

Decided and Filed: June 30, 2011

Before: MARTIN, SILER, and ROGERS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Jacob A. Manning, DINSMORE & SHOHL LLP, Wheeling, West Virginia, Pamela C. Dausman, FOSTER, SWIFT, COLLINS & SMITH, PC, Lansing, Michigan, Paul L. Nelson, FEDERAL PUBLIC DEFENDER'S OFFICE, Grand Rapids, Michigan, for Appellants. Janet L. Parker, ASSISTANT UNITED STATES ATTORNEY, Bay City, Michigan, for Appellee. **ON BRIEF:** Jacob A. Manning, DINSMORE & SHOHL LLP, Wheeling, West Virginia, Michael J. Newman, DINSMORE & SHOHL LLP, Cincinnati, Ohio, Pamela C. Dausman, Frank Harrison Reynolds, Donald E. Martin, FOSTER, SWIFT, COLLINS & SMITH, PC, Paul L. Nelson, FEDERAL PUBLIC DEFENDER'S OFFICE, Grand Rapids, Michigan, for Appellants. Janet L. Parker, ASSISTANT UNITED STATES ATTORNEY, Bay City, Michigan, for Appellee.

————————————

**OPINION**

————————————

SILER, Circuit Judge.  Gary Theunick, Frederick MacKinnon, and Maxwell Garnett (collectively, "Defendants") were convicted of possessing automatic weapons and making false entries on weapons application and transfer forms in violation of 28 U.S.C. §§ 5861(d), 5861(l), and 7206(2).  The Defendants raise various issues on appeal, including the constitutionality of the statutes charged, double jeopardy, discovery errors, and sentencing errors.  For the following reasons, we **AFFIRM.**

**I.**

**A.**

MacKinnon was elected Ogemaw County prosecutor in 1993, where he worked until losing his reelection bid in 2000.  In 1997, he hired Theunick as chief assistant prosecutor.  During MacKinnon's tenure, he and Theunick were the only prosecutors in Ogemaw County.

Garnett was the chief of police in Rose City, Michigan.  During this time, Rose City was comprised of one square mile with a population of 800.  The Rose City Police Department ("RCPD") had one full-time patrol officer and one police car.

In 1997, MacKinnon and Theunick began purchasing machine guns and silencers under the authority of the Ogemaw County prosecutor's office.  They purchased these weapons using Federal Bureau of Alcohol, Tobacco, and Firearms ("ATF") forms for the tax-exempt transfer and registration of firearms.  The sellers, or transferors, of the weapons were National Firearms Act ("NFA") vendors.  The ATF forms indicated that the firearms were "being transferred to . . . a government entity."  The forms contained a box to check if the firearm was being acquired "for personal use," and these boxes were not marked.  The forms also indicated that the weapons were tax-exempt by nature of their use by a government entity.

MacKinnon and Theunick purchased these weapons using their personal funds. They never sought repayment from the Ogemaw County Board of Commissioners, which is the usual procedure for bills incurred at Ogemaw County offices. The Ogemaw County sheriff and the Michigan State Police in Ogemaw County were unaware of the firearms.

In April 2000, Garnett, MacKinnon, and Theunick simultaneously purchased three handguns with silencers, and three additional silencers. Garnett sent the firearms dealer a letter on Rose City letterhead stating, "please accept this letter as an official order . . . . payment made in advance by the county prosecutor Gary Theunick and i [sic] understand that he also will be ordering on his letterhead." The letter also stated that the purchase "is for official law enforcement use only and is not subject to any state or federal taxes [sic]."

After MacKinnon was not reelected as county prosecutor in 2000, he and Theunick executed ATF forms to transfer the weapons and silencers to the RCPD. Separately, Theunick had a document prepared indicating that he donated the weapons to the RCPD. When MacKinnon and Theunick left the prosecutor's office in December 2000 and the incumbent prosecutor arrived, there was no record at the Ogemaw County office of the purchase, possession, or transfer of the firearms.

Theunick then worked as assistant prosecutor in Newaygo County. RCPD records indicate that Theunick also worked a few hours at the RCPD in May 2001. MacKinnon was employed as assistant prosecutor in Midland County, but there is no record of MacKinnon's working at the RCPD. Between February 2001 and April 2001, Theunick and Garnett purchased more machine guns and silencers. On the ATF forms, they identified the RCPD as the transferee. In March 2001, Garnett signed a letter on RCPD letterhead to purchase an AK47 automatic rifle. Theunick negotiated and paid for that purchase, and faxed Garnett's letter from the Newaygo County prosecutor's office to the firearms dealer.

In May 2001, ATF agents conducted an investigation into the transfers from the Ogemaw County prosecutor's office to the RCPD, but found none of the firearms at the

RCPD. Garnett told an agent that Theunick and MacKinnon "never surrendered possession of the weapons." Two months later, the firearms were seized from the RCPD by the Michigan State Police.

In June 2001, Garnett instituted a logbook for signing out the various guns registered to the RCPD. The logbook entries indicate that Theunick and Garnett regularly checked out NFA machine guns and silencers. Other officers signed out only non-NFA firearms. Theunick did not work any hours for the RCPD in June 2001, and worked approximately 40 hours for the RCPD in 2001.

In 2002, MacKinnon possessed a machine gun registered under the RCPD, and shot the machine gun at Garnett's residence with Theunick and other individuals. In February 2003, Garnett and Theunick purchased an additional machine gun under the authority of the RCPD. Garnett's and Theunick's employment with the RCPD was terminated in July 2004. The logbook entries indicate that Theunick kept one machine gun and silencer continuously from December 2003 to December 2004.

**B.**

In 2005, MacKinnon, Theunick, and Garnett were indicted by a grand jury in the Eastern District of Michigan. Each was charged with conspiring to violate 26 U.S.C. § 5861(b), (d), (e), and (l), by receiving, possessing, and transferring machine guns and silencers in violation of the NFA, and by making and causing false entries on NFA applications. The Defendants were also charged with violating 26 U.S.C. § 7206(2) by falsely claiming that the firearm transactions were tax-exempt. They were further charged with the knowing possession of six machine guns and nine silencers not registered in the National Firearms Registration and Transfer Record to the Defendant in possession in violation of 26 U.S.C. § 5861(d), and with making and causing materially false representations to the ATF regarding the identity of the persons obtaining the firearms in violation of 26 U.S.C. § 5861(l).

The Defendants moved to dismiss the indictment for failing to state a criminal act. They argued that they had authority to possess the weapons based on the

documentation they submitted. The district court denied the motion, pointing out that the question presented was whether the Defendants made false representations on such documentation. The Defendants then challenged the constitutionality of §§ 5861(d), 5861(l), and 7206(2) as applied. The district court held that the charging statutes provided adequate notice of the prohibited conduct and denied the motion to dismiss.

The Defendants were convicted of the conspiracy charge and seven counts of tax evasion in violation of § 7206(2). Theunick individually was convicted of ten counts under § 5861(d) and seven counts under § 5861(l). Theunick received concurrent sentences of 60 months on the conspiracy conviction, 63 months for the §§ 5861(d) and (l) convictions, and 26 months for the § 7206(2) conviction. MacKinnon was sentenced to concurrent sentences totaling 60 months. Garnett received aggregate sentences of 71 months.

The Defendants raise various issues on appeal. Each Defendant challenges the constitutionality of §§ 5861(d), 5861(l), and 7206(2) as applied. Theunick individually claims his sentences under both § 7206(2) and § 5861(l) violate the Double Jeopardy Clause, and that the district court erred in refusing to reduce his sentence for acceptance of responsibility. Garnett challenges the district court's refusal to give a public authority jury instruction, contests a discovery ruling, and raises various sentencing issues.

## II.

### A.

We review questions of statutory interpretation *de novo*. *United States v. Morris*, 203 F.3d 423, 424 (6th Cir. 2000). Vagueness challenges that do not involve First Amendment freedoms must be analyzed as applied to the specific facts of the case at hand. *Maynard v. Cartwright*, 486 U.S. 356, 361 (1974).

A criminal statute is unconstitutionally vague if it "fails to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits," or fails to provide standards that prevent arbitrary and discriminatory enforcement. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). "[T]he practical necessities of discharging

the business of government inevitably limit[s] the specificity with which legislators can spell out prohibitions." *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952). It is fair "to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Id.*

The Defendants argue the statutes charged are unconstitutional as applied. They contend that the Internal Revenue Code and NFA statutes charged, in addition to an uncharged provision in 18 U.S.C. § 922(o),[1] "quite clearly permit some governmental employees to possess and transfer automatic weapons, but those statutes are silent as to under whose authority that possession is allowed and are therefore, unconstitutionally vague." They rely on *United States v. Vest*, 448 F. Supp. 2d 1002 (S.D. Ill. 2006), which held several statutes involving the possession and transfer of machine guns unconstitutional as applied to a law enforcement officer.

Contrary to their assertions, the statutes charged are not unconstitutionally vague as applied to these Defendants. In essence, the question presented in this case is whether the Defendants used the authority of their respective offices as a pretext for the personal use of automatic weapons.[2] Pursuant to the statutes charged, the Defendants were on notice that falsifying information on firearm registration and tax-exempt transfer forms clearly constitutes criminal behavior.

---

[1]Section 922(o) makes it "unlawful for any person to transfer or possess a machinegun." Subsection (2) provides that "[t]his subsection does not apply with respect to a transfer to, or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof . . . ."

[2]In ruling on the motion to dismiss, the district court stated: "The [Defendants'] argument is, if the documentation is accurate, there can be no violation because it is not unlawful for public law enforcement entities within a state or political subdivision to possess these weapons. But the Government says, we don't dispute that claim; we do dispute *the genuineness of the representations*, that is, are the defendants using their official position to mask an illegal possession of firearms, that is, to use and possess these weapons personally when in fact there is no authority unless the weapons are possessed and used in an official capacity. And I see that that essentially is *the heart of the question to be tried to the jury*." (emphasis added).

First, 26 U.S.C. § 7206(2)[3] prohibits causing a materially false statement to be made in a document required by the internal revenue laws. An ordinary person readily can understand that misrepresenting the tax-exempt status of a weapon transfer is a crime. Second, 26 U.S.C. § 5861(d)[4] prohibits knowing possession of an NFA firearm not registered to the person in possession. An ordinary person is on notice that disingenuously registering a firearm to an organization, while possessing it personally, violates this provision. Finally, 26 U.S.C. § 5861(l)[5] prohibits knowingly making, or causing to be made, a false entry in the National Firearms Registration and Transfer Record regarding an NFA firearm. An ordinary person is on notice that falsifying information on an NFA form, such as the true identity of the transferee, violates this provision.

The Defendants made multiple representations that the firearms they were purchasing and transferring were for official law enforcement use only, and also represented that the weapons were not for personal use. However, there is no indication that the weapons were used for any law enforcement purposes in the several years the Defendants possessed the weapons. The surreptitious transfer of the weapons from the prosecutor's office to the RCPD after MacKinnon's failed reelection bid supports this conclusion. The Defendants also made multiple representations that the weapons were tax-exempt by nature of their official use. These representations could readily be understood by an ordinary person as false entries prohibited by the statutes charged.

This is not the type of case in which the statutes' potential vagueness is perhaps troubling, such as in the *Vest* case. The defendant in *Vest* was an Illinois State Trooper serving as the lead rifle instructor for the Illinois State Police. 448 F. Supp. 2d at 1004.

---

[3]"Any person who . . . [w]illfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is within the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document . . . . shall be guilty of a felony . . . ."

[4]"It shall be unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record . . . ."

[5]"It shall be unlawful for any person . . . to make, or cause the making of, a false entry on any application, return, or record required by this chapter [the NFA], knowing such entry to be false."

As rifle instructor, his duties included teaching officers to fire a variety of weapons, as well as teaching them to recognize the sound of various weapons, "including automatic, high-powered rifles." *Id.* at 1005 n.1. Previous to his position as lead rifle instructor, he served as the equipment officer for a SWAT team. *Id.* During his time as equipment officer, he ordered a machine gun. *Id.* at 1004.

The defendant was later prosecuted under 18 U.S.C. § 922(o) and 26 U.S.C. § 5861(b) and (d). *Id.* at 1005. He challenged the constitutionality of these statutes as applied, arguing that his possession of the weapons was "strictly related to these unusual law enforcement functions." *Id.* The district court found the statutes vague as applied to the defendant. *Id.* at 1010. The court noted that the police officer was "required to arm himself with an automatic weapon from time to time." *Id.* Moreover, there was "no evidence to support the notion that the defendant ever possessed or used the machine gun at issue in this case for anything other than law enforcement purposes." *Id.*

By contrast, § 922(o) is not charged in this case, and the law enforcement defense in § 922(o)(2)(A) does not appear to extend to the statutes charged. There is no indication that any of the Defendants were members of a specialized law enforcement unit responsible for weapons instruction. Furthermore, the Defendants appear to have possessed the weapons exclusively in a personal capacity, without any legitimate law enforcement purpose.

The Defendants raise interesting issues regarding the applicability of these statutes to law enforcement personnel. For example, Theunick asks, "Who chooses which police departments–or indeed, which officers–should have automatic weapons and which should not?" This question is not answered by the statutory text. In this case, however, a separate question is the central issue, namely, whether the Defendants used the authority of their positions as a pretext for acquiring multiple machine guns for their personal use. This distinct question was answered by the jury in the affirmative.

**B.**

Theunick individually argues that the offenses charged under § 7206(2) and the offenses charged under § 5861(l) criminalize the same conduct and contain "the same core elements." He requests that we remand to the district court with instructions that it exercise its discretion and vacate his conviction under either the § 7206(2) counts or the § 5861(l) counts.[6] We review Theunick's double jeopardy claim for plain error because he failed to raise it at the district court. Fed R. Crim. P. 52(a); *United States v. Olano*, 507 U.S. 725, 732 (1993).

No person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The prohibition against double jeopardy protects individuals from multiple punishments for the same offense. *United States v. DeCarlo*, 434 F.3d 447, 454 (6th Cir. 2006). "However, a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause." *Id.* (internal quotation marks omitted).

"[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). In *Blockburger*, two distinct offenses were charged, including the selling of narcotics without the original stamped package and the selling of narcotics not in pursuance of a written order of the person to whom the drug is sold. *Id.* at 303-04. Each offense was based upon the single sale of narcotics by the defendant. *Id.* at 304. Because "each statute requires proof of an additional fact which the other does not," the defendant's single act could be prosecuted under both statutes without violating double jeopardy. *Id.*

The elements of § 5861(l) and § 7206(2) substantially overlap. Each requires proof that Theunick provided materially false information. However, each statute requires proof of a different fact relative to the misrepresentation that is specific to the

---

[6]Theunick's sentences are concurrent, so this remedy would not reduce his time served.

respective statutory schemes.  First, § 7206(2) requires proof that the misrepresentation was made in connection with the internal revenue laws.  By contrast, § 5861(l) requires proof that the misrepresentation was made on an application or record required by the ATF.  Because "each statute requires proof of an additional fact which the other does not," Theunick can be prosecuted under both statutes without violating double jeopardy. *Id.*[7]

## C.

Theunick next argues the court erred in refusing to reduce his sentence based on his acceptance of responsibility.  Because the "sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility . . ., the determination of the sentencing judge is entitled to great deference on review."  USSG § 3E1.1(a) n.5.  We therefore review the district court's determination for clear error. *United States v. Wolfe*, 71 F.3d 611, 615-16 (6th Cir. 1995).

USSG § 3E1.1(a) provides for a two-level decrease in offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense."  "In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial."  USSG § 3E1.1 n.2.  "This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." *Id.*  "In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct." *Id.*

---

[7]Theunick relies on our decision in *DeCarlo*, 434 F.3d at 456, in which we wrote that "the Supreme Court modified the application of the *Blockburger* test in *Whalen* [*v. United States*, 445 U.S. 684 (1980)] and *Illinois v. Vitale*, 447 U.S. 410 (1980), when dealing with complex and overlapping statutes that define multiple ways that they may be violated and contain alternative elements." *Id.*  The statute in *DeCarlo* contained multiple alternative elements, any of which could be charged by the government. Similarly, *Whalen* involved a felony murder statute that specified six alternative felonies as predicates. 445 U.S. at 1434.  The double jeopardy analysis with such statutes is "modified" in that the court first "constructs from the alternative elements within the statute the particular formulation that applies to the case at hand" before applying the *Blockburger* test.  These cases do not modify our analysis because the statutes charged in this case do not contain such alternative elements.

The district court did not clearly err in sentencing Theunick. Theunick argues that he went to trial merely to preserve his legal argument regarding the constitutionality of the statutes as applied. However, the question at trial was "not the documentation's facial validity, but instead the genuineness of the representations made in the documentation and the identity of the true owner." The government's position is that "the applications were completed with fraudulent designs." These factual questions were resolved by the jury after Theunick "put the government to its burden of proof at trial." *See* USSG § 3E1.1 n.2. Additionally, the district court noted that Theunick's actions prior to and during trial, including "post-indictment amendments of tax returns" and "playing coy," failed to demonstrate that he accepted responsibility.

**D.**

Garnett contends the court erred by refusing to give his proposed public authority defense instruction. We review the district court's denial of jury instructions for abuse of discretion.[8] *King v. Ford Motor Co.*, 209 F.3d 886, 897 (6th Cir. 2000). The failure to give a requested jury instruction is an abuse of discretion when it is "(1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." *United States v. Franklin*, 415 F.3d 537, 553 (6th Cir. 2005). We review jury instructions "as a whole" in order to determine whether they "adequately inform the jury of relevant considerations and provide a basis in law for aiding the jury to reach its decision." *Id.* (internal quotation marks and citations omitted).

A trial judge is "not required to adopt the language suggested by a defendant in the Court's instructions to the jury." *United States v. Garner*, 529 F.2d 962, 970 (6th Cir. 1976). "[H]owever, when a theory of defense finds some support in the evidence

---

[8]The government argues that plain error review applies because Garnett failed to preserve his objection to the court's jury instruction. However, Garnett's counsel objected during the court's pre-instruction discussion. After the court instructed the jury, the court asked whether Garnett had any objections "other than the objections we have already stated to the instruction[.]" Garnett responded no, indicating that he had no *additional* objections, rather than no objections at all. Accordingly, we review for abuse of discretion.

and in the law, a defendant is entitled to some mention of that theory in the instructions." *Id.*

The "public authority defense" encompasses "three versions," two of which are relevant here. *United States v. Valentine*, No. 94-6195, 1995 WL 390322, at *5 (6th Cir. June 30, 1995) (unpublished) (citing cases from the First, Ninth, and Eleventh Circuits). First, with the "public authority" defense, the defendant "seeks exoneration based on his reasonable reliance on the authority of a government official to engage him in a covert activity." *Id.* (citing *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994)). "The validity of this defense depends upon whether the government agent in fact had the authority to empower the defendant to perform the acts in question." *Id.* A second iteration is "entrapment by estoppel." *Id.* at *6. "This defense applies when a government official tells a defendant that certain conduct is legal and the defendant commits what would otherwise be a crime in reasonable reliance on the official's representation." *Id.* Although it is somewhat unclear which type of public authority defense instruction Garnett requested, it appears that it is the entrapment by estoppel defense.[9]

"Entrapment by estoppel is an affirmative defense that is rarely available." *United States v. Rector*, 111 F.3d 503, 506 (7th Cir. 1997), *overruled on other grounds*, *United States v. Wilson*, 169 F.3d 418, 426-27 (7th Cir. 1999) (internal citations omitted). The defense requires a factual basis that must be established by the defendant. Specifically, the defendant must show that the individual who misled the defendant was an official of the state; the official actively misled the defendant; and the defendant's reliance was actual and reasonable. *Rector*, 111 F.3d at 506; *accord United States v. Aquino-Chacon*, 109 F.3d 936, 938 (4th Cir. 1997); *United States v. Trevino-Martinez*, 86 F.3d 65, 69 (5th Cir. 1996); *United States v. Smith*, 940 F.2d 710, 714 (1st Cir. 1991); *United States v. Brebner*, 951 F.2d 1017, 1024 (9th Cir. 1991).

---

[9]Although Garnett's notice of the public authority defense did not specify which iteration of the defense applied, the parties later discussed the proposed defense using the phrase "entrapment by estoppel."

Fed. R. Crim. P. 12.3(a) requires the defendant who intends to request the public authority defense to notify the court and government in advance.  The notice must contain the following information:  "(A) the law enforcement agency or federal intelligence agency involved; (B) the agency member on whose behalf the defendant claims to have acted; and (C) the time during which the defendant claims to have acted with public authority."  Fed. R. Crim. P. 12.3(a)(2).

The district court did not abuse its discretion in denying Garnett's jury instruction on entrapment by estoppel.  First, Garnett's notice did not include all of the information required by Fed. R. Crim. P. 12.3.  He failed to specify in the notice the official he claims to have relied upon, instead appearing to suggest that he relied on his own authority.  Garnett's notice also contained an incorrect statement of the law.  *See Franklin*, 415 F.3d at 553.  It stated that the "government must prove beyond a reasonable doubt that the Defendant did not have actual authority or a reasonable belief that he was acting within the scope of his authority as the Chief of Police."  However, the defendant bears the burden of proving the affirmative public authority defense.  *See Dixon v. United States*, 548 U.S. 1, 7-17 (2006); *Trevino-Martinez*, 86 F.3d at 69.

Additionally, the district court determined that Garnett had not established the requisite factual basis for the public authority defense.  Garnett testified at trial that he was told by an unnamed inspector at ATF or NFA that it was permissible for him to purchase, register, and transfer as tax-exempt an NFA firearm.  The court found this testimony inadequate to support the defense:

> The testimony was first fairly vague and non-specific.  Secondly, the nature and scope of the official's duties and position remains unexplained. Third, the statements allegedly made by the official remain fairly vague and unlikely to establish the kind of predicate factually that is ordinarily required to justify the giving of this instruction. Finally, and probably most importantly, all of these things are merely the defendant relating what he heard . . . . unsupported by any documentation, unsupported by any testimony from any Government agent, unsupported by any data sheets, physical evidence or the like.

Accordingly, Garnett's testimony failed to establish the factual basis to justify the rare case in which an entrapment by estoppel instruction should be given. *See Rector*, 111 F.3d at 506.

The court noted that, although Garnett's testimony did not support providing the specific instruction requested, it could nevertheless "color the jury's determination of the intent with which he acted; the knowledge, the specific intent or lack of it and so forth."  That is, the jury could use Garnett's testimony in evaluating whether he knowingly made fraudulent representations in the firearm applications.  The jury could also use this testimony in determining whether the employee possessing the firearm was authorized by the law enforcement organization to possess the firearms within the scope of the authorization and his official duties.  These instructions allowed the jury to acquit Garnett if it believed that he legitimately possessed the weapons for official purposes.

**E.**

Garnett claims the district court erred by quashing certain subpoenas.  We review the district court's decision to quash a subpoena duces tecum under Fed. R. Crim. P. 17(c) for abuse of discretion.  *United States v. Hughes*, 895 F.2d 1135, 1145 (6th Cir. 1990) (citing *United States v. Nixon*, 418 U.S. 683, 702 (1974)).  The court's decision should not be disturbed absent a showing that it was "clearly arbitrary or without support in the record."  *Id.*

Production of documents pursuant to Fed. R. Crim. P. 17(c) is appropriate where "1) the documents are evidentiary and relevant; 2) they are not otherwise procurable, with due diligence, in advance of trial; 3) the party cannot properly prepare for trial without such production and inspection in advance of trial; and 4) the application was made in good faith and is not a fishing expedition."  *Nixon*, 418 U.S. at 699.

In this case, the Defendants' discovery requests and the government's opposition to them spanned a period of two years, with the district court eventually granting the government's motion to quash the subpoenas.  The discovery motions requested various government records related to weapons, including current inventory, regulations,

policies, and training manuals, from "all governmental agencies which are within the Department of Justice, the Department of Treasury, or the Department of Homeland Security," as well as the ATF, Federal Bureau of Investigation, Customs and Border Patrol, Secret Service, United States Marshals Service, Immigration and Naturalization Service, and Internal Revenue Service. According to Garnett, the requested materials were "central" to their defense, "which is that [their] alleged behavior is consistent with . . . behavior of federal and state law enforcement authorities."

As an initial matter, Theunick, rather than Garnett, filed the discovery requests. Garnett filed a notice of joinder in Theunick's requests, but excluded paragraphs six through nine. Garnett appears to raise paragraphs six and seven of the discovery motion on appeal. The government argues that Garnett cannot raise the issue on appeal. Garnett disputes this argument, citing his notice of joinder, his support of Theunick's discovery motions in court hearings, and the fact that the Defendants "pursued the common goals of obtaining discovery and asserting similar arguments."

Even if we assume Garnett properly joined in Theunick's discovery requests, the district court did not abuse its discretion in quashing the subpoenas. It offered two reasons for its decision. First, the court determined that the requested information was irrelevant "within the four corners of the indictment," because the indictment charged specific statutes requiring the government to prove the narrow issues of false statements, false entries, and possession.

Second, the government stipulated that it would not argue in its case-in-chief "whether it was an unusual event for a prosecutor's office to obtain NFA weapons," or "compare this prosecutor's office to other prosecutor's offices." This last point is particularly persuasive, given that Garnett himself requested that the government be prohibited from making such comparisons at trial, on the basis "that whether any, some, most or no other prosecutor's office obtained similar firearms has no bearing on the legality of the purchase and later transfer of these firearms to the Rose City Police Department . . . and that any references to other offices is wholly irrelevant." Given the

government's stipulation and the nature of the Defendants' discovery requests, the district court's decision to grant the motion to quash was not an abuse of discretion.

**F.**

Garnett also claims errors in his sentencing.  The district court's fact-bound application of the Sentencing Guidelines is entitled to deferential review, *Buford v. United States*, 532 U.S. 59, 64-66 (2001), and should be set aside only if it is clearly erroneous, *United States v. Lang*, 333 F.3d 678, 682 (6th Cir. 2003).  When the defendant's arguments "rest on the legal interpretation" of the Guidelines, we review the court's interpretation *de novo*.  *United States v. Peveler*, 359 F.3d 369, 373 (6th Cir. 2004).  However, "we shall not review decisions of a district court not to depart downward unless the record reflects that the district court was not aware of or did not understand its discretion to make such a departure." *United States v. Puckett*, 422 F.3d 340, 345 (6th Cir. 2005).

Garnett first argues the district court erred by failing to depart downward pursuant to USSG § 5H1.4 because of his numerous medical conditions.  These conditions include insulin-dependent diabetes, arthritis of the spine and hips, neuropathy, heart problems, and unspecified complications from his previous exposure to Agent Orange.  However, the district court's decision was not clearly erroneous.  The court heard testimony of a nurse practitioner in support of the requested departure, and the government did not contest Garnett's medical needs.  The court concluded that the Bureau of Prisons was able to satisfy his medical requirements.  *See United States v. Russell*, 156 F.3d 687, 694 (6th Cir. 1998).  The court also stated that it considered Garnett's health problems in imposing a sentence at the low end of the Guidelines range.

Garnett next argues the court should have departed downward pursuant to USSG § 5H1.11 because of his military and public service.  Garnett served in Vietnam, and worked as a law enforcement officer for many years.  Again, the court's decision was not clearly erroneous. The court characterized Garnett's request for downward departure based on his public service as "ironic," because "the essence of the criminal activity of which the defendant was convicted is inextricably tied up with the official law

enforcement position."   Because "the crime wouldn't have been able to have been committed in the way in which it was had it not been for the position of public authority and public trust that the defendant occupied as chief of police," a downward departure based on public service was not warranted.

Garnett's arguments regarding these two denials of downward-departure requests are without merit, as the denials are unreviewable decisions under *Puckett*.  And to the extent Garnett is considered to be arguing that his overall sentence was unreasonable as a result of the downward-departure denials, the district court's aforementioned justifications readily convince us that Garnett's sentence is not unreasonable because of the denials.

Garnett also contests the court's two-point increase in his Guidelines score under USSG § 3B1.3 for abuse of a position of public trust, because that section "may only be applied where the defendant abused a position of trust with the *victim* of his charged conduct."  Because "the alleged 'victim' in this case would be the public at large, not a particular victim," Garnett contends the enhancement was improper.  He cites *United States v. White*, 270 F.3d 356, 371 (6th Cir. 2001), for this proposition.

Garnett's interpretation of the Guidelines is untenable.  In *White*, we "explicitly [held] that the general public may be victims of a government employee's crimes for purposes of deciding whether the employee's sentence may be enhanced pursuant to § 3B1.3." *Id.*  Accordingly, the district court properly applied the Guidelines when it enhanced Garnett's sentence based on its determination that he abused the "trust that the citizens of Rose City and city council placed in" him as police chief.

**AFFIRMED.**