NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0673n.06

No. 11-5433

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Jun 22, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| ROBERT VELEZ, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: SILER and KETHLEDGE, Circuit Judges; GRAHAM,[*] District Judge.

GRAHAM, District Judge.    Defendant-appellant, Robert Velez, was charged by a second superseding indictment filed on December 9, 2008, in the United States District Court for the Eastern District of Tennessee, with conspiracy to distribute and to possess with the intent to distribute oxycodone in violation of 21 U.S.C. § 846 (Count 1); aiding and abetting the use, carrying and discharge of a firearm during and in relation to a drug offense in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2 (Count 4); use of a communications facility in violation of 21 U.S.C. § 843(b) (Counts 5-8 and 10); and being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Counts 14-16).  Count 16 was dismissed on motion of the government prior to trial.

---

[*] The Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

I.  Factual Background

The case was tried before a jury.  The evidence at trial revealed that Travis Ray Mombrun began supplying Velez with 30-mg Roxycodone pills in South Florida in late 2007.  Roxycodone is the trade name for a quick-release oxycodone tablet.  During the course of the conspiracy, Mombrun supplied Velez with between 10,000 and 20,000 pills.

Justin Horton began purchasing Roxycodone pills from Velez in February of 2008.  Horton testified that he traveled to Florida to get pills from Velez on three occasions, and also obtained pills from Velez when he started bringing pills to Tennessee.  Horton also testified concerning the robbery of his apartment on June 2, 2008.  When notified of the robbery while at Velez's motel room, Horton and Velez attempted to drive to Hortons' apartment in Velez's rental truck, taking with them a Yugoslavian-made SKS assault rifle with a bayonet which Velez obtained from under the mattress at his motel room.  After the truck broke down, they headed toward Horton's apartment on foot. Horton had three guns in his apartment, including another SKS assault rifle, a shotgun, and a handgun.  Horton loaded his guns, intending to pursue and find the person who committed the robbery, but he abandoned that plan when the police, responding to a neighbor's call, arrived at the apartment.

The government also presented the testimony of other co-conspirators who purchased pills from Velez, including Jordan Pierce (Horton's brother), Michael Cline, Joel Rickard, Chris Cortless, and Brandon Smallman. Jennifer Green, Smallman's girlfriend, counted 30-mg Roxycodone tablets for Velez when he came to Tennessee, and wired money to him in Florida.  Brian Still made three

trips to Florida at Velez's request to purchase 30-mg Roxycodone pills through Louis Ezyaguirre, as associate of Velez in Florida.

Smallman was arrested in his motel room on an outstanding bench warrant on July 18, 2008, and his drug money was seized. He agreed to cooperate with law enforcement. When Velez concluded that Smallman intended to keep the money owed to Velez for the pills, he sent Horton and Pierce to look for Smallman and to collect the debt. Horton found Smallman at the residence of Dustin Patterson, pointed a shotgun at Smallman and fired the gun to scare him. Horton called Velez on the phone to tell him that Smallman did not have the money with him. Smallman told Velez that he had the money at his house, and that Horton could ride with him to get it. However, Smallman drove off before Horton could get in the car. Horton fired two shots at the moving car using a handgun. Horton then called Velez to report that he had fired at Smallman's vehicle and that he was pursuing Smallman. Velez told him to get rid of the guns and go the opposite way. Velez was arrested on September 29, 2008, and denied any involvement in the sale of Roxycodone.

The district court denied the motions for judgment of acquittal made at the close of the government's case and at the close of all evidence. On July 19, 2009, the jury returned a verdict of guilty on all counts with the exception of a not guilty verdict on Count 15, one of the felon in possession charges. On January 29, 2010, the district court denied Velez's motion for a new trial on Count 4.

At the sentencing hearing held on March 21 and 28, 2011, the district court found that Velez was responsible for at least 8,400 30-mg oxycodone pills, resulting in a base offense level 32 under § 2D1.1(a)(3)(c)(4) of the United States Sentencing Guidelines ("U.S.S.G."). The district court also

3

found that Velez warranted a four-level enhancement under U.S.S.G. § 3B1.1(a) for being an organizer or leader of criminal activity involving five or more participants. Velez's total offense level was 36, with a range under the advisory Sentencing Guidelines of 324 to 405 months. When combined with the mandatory ten-year consecutive sentence on the § 924(c) count, this resulted in a final range of 444 to 525 months. The district court imposed a sentence which effectively added up to 444 months of incarceration, to be followed by five years of supervised release. Velez now pursues the instant appeal.

## II. Sufficiency of the Evidence

The first issue raised by Velez is whether the evidence was sufficient to support his conviction on Count 4, the § 924(c) charge. "We review de novo the district court's denial of a motion for judgment of acquittal pursuant to Fed.R.Crim.P. 29 and assess the evidence 'in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Wettstain*, 618 F.3d 577, 583 (6th Cir. 2010)(quoting *United States v. Campbell*, 549 F.3d 364, 374 (6th Cir. 2008)).

A defendant bears "a heavy burden when asserting insufficiency of the evidence arguments." *Id.* "The appellate court must view all evidence and resolve all reasonable inferences in favor of the government." *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007). As the reviewing court, we do "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypotheses except that of guilt." *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999).

To sustain a conviction on Count 4, the government had to prove that Velez "offered assistance or encouragement to his principal in the commission of a substantive offense." *United States v. Davis*, 306 F.3d 398, 409 (6th Cir. 2002)(quoting *United States v. Webber*, 208 F.3d 545, 553 (6th Cir. 2000))(internal quotes and citations omitted). Aiding and abetting involves an act by a defendant which contributes to the execution of a crime, and the intent to aid in its commission. *United States v. Lowery*, 60 F.3d 1199, 1202 (6th Cir. 1995).

A defendant may be convicted for aiding and abetting an offense under § 924(c). *United States v. Franklin*, 415 F.3d 537, 554 (6th Cir. 2005). A conviction under §924(c) may be upheld under an aiding and abetting theory even in a case in which the defendant never had actual possession of a firearm during the commission of the crime, *see Rattigan v. United States*, 151 F.3d 551, 557 ((6th Cir. 1998), or never personally used or carried any weapon during the offense, *see United States v. Wright*, 182 F.3d 458, 464 (6th Cir. 1999). The government is not required to prove that the defendant performed some act that directly facilitated or encouraged the use of a firearm. *United States v. Hopson*, 134 F.App'x 781, 793 (6th Cir. 2004). Rather, to establish that the defendant acted as an aider and abettor, the government must prove "that the defendant, as the accomplice, associated and participated in the use of the firearm in connection with the underlying ... crime." *Franklin*, 415 F.3d at 554-55. Thus, the government was required to prove that Velez "knew one of his accomplices possessed a gun in furtherance of a drug trafficking offense and that [he] acted with the intent to assist or influence the commission of the underlying drug trafficking crime." *United States v. Gardner*, 488 F.3d 700, 712 (6th Cir. 2007).

Velez argues that the evidence is insufficient to support his conviction because there was no direct evidence that he told Horton and Pierce to use firearms, or that he knew that they were going to use firearms in attempting to collect money from Smallman. However, as noted above, circumstantial evidence alone is sufficient to sustain a conviction, *Spearman*, 186 F.3d at 746, and previous Sixth Circuit cases indicate that no exception to this general rule has been applied in § 924(c) cases.

In *United States v. Robinson*, 389 F.3d 582, 591 (6th Cir. 2004), the defendant argued that his § 924(c) conviction was invalid because there was no evidence that the use of guns was discussed in his presence prior to the bank robbery, or that his co-defendants had displayed their weapons to him. In affirming the conviction, the court noted that "[a]lthough there might not be any direct evidence that the use of firearms was discussed in Robinson's presence, the district court did not err in finding that Robinson aided and abetted his co-conspirators in using weapons during the court of the first bank robbery." *Id.* Robinson drove his co-defendants to the bank, the co-defendants brandished firearms during the robbery, Robinson permitted them to use his car as the getaway vehicle, one of the co-defendants left the guns in Robinson's vehicle after the robbery, and Robinson benefitted from the use of the firearms by sharing in the proceeds of the robbery. The court concluded that each of these facts could lead a rational trier of fact to infer that Robinson knew that his co-defendants intended to brandish firearms in the first robbery. *Id.*

In *United States v. Warner*, 10 F.3d 1236, 1239 (6th Cir. 1993), the court rejected the defendant's argument that he could not be convicted under § 924(c) for using or carrying a firearm in relation to a drug offense because he did not know of the existence of the .30 caliber revolver

6

possessed by his accomplice during his drug-dealing activities. There was evidence that the defendant possessed a firearm within a month of his arrest which could have been the same firearm used by his co-defendant, that defendant and his accomplice worked closely together to distribute drugs, and that it was understood between them that the accomplice would guard the drugs while defendant was out of town meeting a buyer. The court concluded that a rational juror could determine from this evidence that the defendant knew of the existence of the revolver and knew that the accomplice would have the gun at hand while protecting the drugs. *Id*.

In *Wright*, the court upheld the district court's conclusion that the evidence was sufficient to support defendant's conviction for aiding and abetting a § 924(c) offense. 182 F.3d at 466. Based on evidence of a "shoot out" and the presence of armed guards at the location where defendant was involved in the drug operation, the court concluded that a jury could infer that the defendant knew that his co-conspirators were armed and that he had accepted the protection offered by the guns, even though the defendant claimed that he primarily "cut" cocaine in the back room, and the government's witness testified that he never saw the defendant with a weapon. *Id.* at 465-66.

In the instant case, evidence was presented that Velez was present at Horton's apartment on June 2, 2008, and that he saw that Horton had three guns, including an SKS assault rifle, a shotgun, and a handgun. Velez and Horton had fired the guns behind Horton's apartment earlier that day, so Velez knew the guns were operable. Horton believed the robbery occurred because someone thought he had pills in the residence. The people in the apartment started loading the guns, as it was Horton's intent to pursue the person who had committed the robbery at the apartment. Velez was supplying Horton with pills and knew that he was a drug dealer. Velez himself had an SKS assault

rifle and a .22 Derringer handgun on the day of the robbery, which he attempted to bring to Horton's apartment. Velez was also seen carrying a handgun in his waistband while selling pills to Rickard.

The jury could reasonably find that Velez knew that Horton had firearms at his residence, and that Horton could be expected to use those firearms to protect his drug supply and to commit violent acts in furtherance of the drug operation. *See United States v. Hardin*, 248 F.3d 489, 499 (6th Cir. 2001)("This Court has held many times that guns are 'tools of the trade' in drug transactions."); *United States v. Williams*, 31 F.3d 522, 526 (7th Cir. 1994)("Because the drug industry is, by nature, a violent business, the presence of firearms in transactions involving sizeable quantities of drugs is reasonably foreseeable."). The jury could also reasonably infer that Velez knew that Horton and Pierce would be armed when they went to collect money from Smallman, because Velez, Horton, and Pierce would have had every reason to believe that Smallman, a drug dealer, would also be armed (in fact, a handgun was seized from Smallman on the date of his arrest).

There was additional testimony from which the jury could reasonably find that Velez knew that Horton and Pierce would use and discharge firearms to collect money from Smallman. Velez told Horton to collect the money from Smallman, and further told Horton that if he "ever got ahold of him, beat him up or take it or whatnot." According to Horton, Velez told him to find Smallman, as "[h]e wanted me to whoop his ass and get his money back." Horton understood this to mean that "he wanted his money by any means possible." Horton and Velez did not specifically discuss using firearms, but Horton testified that he "took it [Velez] wanted his money any way, so I figured that would scare him [Smallman]." Velez stood to benefit from Horton's use of a firearm in attempting to scare Smallman into paying the debt owed to Velez.

8

After Horton fired two shots at Smallman's car using a handgun, he called Velez to report that he had fired at the fleeing vehicle and that he was following Smallman. At that point, Horton and Pierce were still attempting to catch Smallman to continue the confrontation. Velez told Horton to hide the guns and to go the other way. Thus, the jury could reasonably find that even after Velez was specifically informed of the use of firearms by Horton, he continued to participate in this incident during and in relation to the conspiracy by advising Horton to hide the guns and to escape, thereby attempting to conceal from law enforcement the acts of his co-conspirators, as well as his own involvement in instigating the collection of the drug debt. *See United States v. Hicks*, 79 F.App'x 749, 751 (6th Cir. 2003)(finding a sufficient factual basis for § 924(c) plea, despite defendant's claim that he did not know co-defendant was carrying a firearm until they entered the bank, where defendant continued to participate in the robbery after he saw co-defendant brandishing a gun); *United States v. Taylor*, 226 F.3d 593, 596-97 (7th Cir. 2000)(defendant's continued participation in the offense after learning of accomplice's use of firearms by facilitating accomplice's escape was sufficient to satisfy the requirements for aiding and abetting a § 924(c) offense).

Evidence was also presented that Velez later admitted to Smallman that he sent Horton and Pierce to collect the debt. He urged Smallman not to testify against Horton and Pierce, continued to attempt to collect the debt from Smallman, left a threatening voice mail message for Smallman, stating "game over, I'm finished fooling with you," and stated that he had put up additional money for a bounty to encourage people to find out where Smallman was hiding.

The cases relied on by Velez are readily distinguishable. In *United States v. Thomas*, 987 F.2d 697, 700 (11th Cir. 1993), the court held that the evidence was insufficient to support the

defendant's conviction under § 924(c) where there was no evidence that he knew about the firearm found tucked into the co-defendant's pants and one co-conspirator testified that the participants in the attempted drug transaction had agreed not to bring weapons. In *United States v. Medina*, 32 F.3d 40, 45-46 (2d Cir. 1994), the court reversed a § 924(c) conviction where there was no evidence that the defendant acted in any way to facilitate or encourage the co-defendant's use of a firearm during robbery. In the instant case, there is ample circumstantial evidence from which the jury could reasonably find that Velez knew that Horton and Pierce would use and discharge firearms during and in relation to the conspiracy while attempting to collect the drug debt owed to Velez, and that Velez aided and abetted the offense. The district court did not err in denying defendant's motions for a judgment of acquittal on Count 4.

## III. Drug Quantity as Relevant Conduct

Velez also argues that the district court erred in determining the quantity of drugs to be used as relevant conduct for purposes of calculating his offense level under the advisory Guidelines. The district court's drug quantity calculations are reviewed for clear error. *United States v. Olsen*, 537 F.3d 660, 663 (6th Cir. 2008). "Questions involving the interpretation of the guidelines are legal questions that this Court reviews *de novo*." *United States v. Murphy*, 241 F.3d 447, 458 (6th Cir. 2001). "A factual finding is clearly erroneous 'when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *United States v. McGee*, 494 F.3d 551, 554 (6th Cir. 2007)(quoting *Tran v. Gonzales*, 447 F.3d 937, 943 (6th Cir. 2006)).

A defendant involved in a drug conspiracy is generally responsible for the drug quantities for which he is directly involved and any quantity that is a reasonably foreseeable consequence of the conspiracy. *United States v. Caver*, 470 F.3d 220, 246 (6th Cir. 2006). "A drug quantity need only be established by a preponderance of the evidence, and an estimate will suffice so long as it errs on the side of caution and likely underestimates the quantity of drugs actually attributable to the defendant." *United States v. Anderson*, 526 F.3d 319, 326 (6th Cir. 2008). The government must prove the amount to be attributed to a defendant. *United States v. Swanberg*, 370 F.3d 622, 625 (6th Cir. 2004).

In the Presentence Investigation Report ("PSR"), the probation officer determined that the amount of oxycodone attributable to Velez as relevant conduct was 8,400 30-mg oxycodone tablets. Converted to 1,688.4 kilograms of marijuana, *see* U.S.S.G. § 2D1.1 cmt. n.10(*E*), which specifies that one gram of oxycodone equals 6,700 grams of marijuana, this yielded a base offense level of 32 (applicable to 1,000 to 3,000 kilograms of marijuana) under U.S.S.G. § 2D1.1(a)(3)(c)(4). The probation officer arrived at this amount by considering the testimony of Mombrun, who stated that he delivered 200 to 1,000 tablets to Velez every week or every other week from early 2008 to August 2008, an average of 600 tablets on 14 occasions. Velez objected to the calculations of the probation officer. He noted that no drugs were seized from him, and argued that a more reasonable estimate would be to hold him accountable for 200 tablets delivered every other weekend from March 1, 2008, through August 2, 2008, in other words, for eleven weekends, for a total of 2,200 tablets.

The district court found that Velez should be accountable for at least 8,400 oxycodone tablets. This was a conservative estimate. Mombrun testified that he supplied Velez with a total of

10,000 to 20,000 pills. Although this testimony alone would be sufficient to support the district court's quantity finding, the record includes additional evidence that Velez supplied these oxycodone tablets to other conspirators. Even accepting Horton's lower quantity estimates, there is testimony that Horton obtained at least 9,000 pills from Velez. Smallman testified that he obtained 3,000 pills from Velez. Eyzaguirre testified at his plea hearing that he obtained 700 pills from Velez. Jordan Pierce testified that Velez supplied him with at least 1,500 pills. Michael Cline purchased at least 2,500 pills from Velez beginning in March of 2008, and Joel Rickard purchased at least 150 pills from Velez. Velez also supplied Chris Cortless with at least 900 pills starting in May 2008. These quantities are more than sufficient to support the district court's findings. Further, as the district court noted, only 4,975.1 oxycodone tablets would be required to meet the threshold amount of 1,000 kilograms of marijuana necessary to qualify for a base offense level 32. *See* § 2D1.1(a)(3)(c)(4) and cmt. n.10(*E*).

Velez argues that Mombrun's testimony was not credible and that the probation officer's quantity determination was based on the allegedly unreliable testimony of accomplices who were cooperating with the government and who were drug users testifying about events which occurred two years in the past. However, "[t]estimonial evidence from a coconspirator may be sufficient to determine the amount of drugs for which another coconspirator should be held accountable." *United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000). In many instances, the conspirators in this case corroborated each other's testimony.

In regard to the use of drugs by witnesses, Velez presented the testimony of Dr. Jonathan Lipman, a neuropharmacologist, regarding the effects of Roxycodone, a pain reliever, and Xanax

12

(alprazolam), a tranquilizer/sedative, on memory. However, Dr. Lipman was unable to offer an opinion to a reasonable degree of scientific certainty that any witnesses in the case gave unreliable testimony due to their use of oxycodone or alprazolam because he was not aware of any relationship between the period of their drug use and the events about which they testified. Thus, the district court properly concluded that his testimony was not relevant to the issues before the court. In addition, Dr. Lipman testified that the users of these drugs could build up a tolerance for them and still function. Smallman testified that the pills did not bother his memory, as he had a high tolerance for them.

The district court correctly found by a preponderance of the evidence that Velez should be accountable for at least 8,400 oxycodone tablets.

## IV. Enhancement for Role in Offense

The standard of review applicable to the application of an enhancement under U.S.S.G. §3B1.1(a) is undecided. *United States v. Walls*, 546 F.3d 728, 734 (6th Cir. 2008). In the past, this court "reviewed the district court's factual findings for clear error and its legal conclusions de novo." *United States v. McDaniel*, 398 F.3d 540, 551 n. 10 (6th Cir. 2005). However, in *Buford v. United States*, 532 U.S. 59, 66 (2001), the Supreme Court held that a district court's application of the Guidelines should be reviewed deferentially rather than de novo. *See United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009). This issue need not be resolved in this case, because the leadership adjustment was appropriate under either standard of review.

Under § 3B1.1(a), a defendant's offense level is increased by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was

otherwise extensive[.]" U.S.S.G. §3B1.1(a). A defendant qualifies for the enhancement upon a finding by the district court that the defendant has exercised decisionmaking authority, recruited accomplices, received a larger share of the profits, was instrumental in the planning phase of the criminal venture, or exercised control or authority over at least one accomplice. *Vasquez*, 560 F.3d at 473. More than one person involved in an offense may be a leader or organizer. *Id.* (citing U.S.S.G. § 3B1.1, cmt. n. 4).

The probation officer determined that Velez merited a four-level enhancement under § 3B1.1(a) for his role in the offense as the organizer or leader of a conspiracy involving five or more participants. Velez objected to this finding, arguing that he was simply the middleman in the oxycodone distribution chain and that the evidence was insufficient to show that he exercised organizational or leadership control or direction over another culpable participant in the offense.

The probation officer relied on testimony that Velez directed Horton and Pierce regarding the collection of the drug debt from Smallman on July 21, 2008, that he directed Still and Eyzaguirre to travel to Florida in September of 2008 to obtain oxycodone, that he told Smallman how to wire drug proceeds to him, and that he directed Green to obtain hotel rooms for him in her name. The probation officer also concluded that the conspiracy included at least eleven participants.

The district court, noting the comments of the probation officer, found that the participants in the conspiracy included Velez, Horton, Pierce, Smallman, Green, Eyzaguirre, Still, Cortless, Joshua Cody (who accompanied Smallman on his last trip to obtain pills from Velez in Florida and obtained 100 pills from Smallman), and Cody's mother. The district court found by a preponderance of the evidence that Velez directed Horton and Pierce to collect the drug debt owed by Smallman,

14

that he directed Eyzaguirre to travel from Florida to Tennessee to transport oxycodone, that he directed Still to deliver money to Eyzaguirre in Florida and to obtain oxycodone from Eyzaguirre, that he instructed Green to obtain motel rooms for him, and that he directed Smallman to wire the payment for drug debts to Velez in Florida. The record also includes evidence that Velez recruited Smallman as an accomplice after a falling-out with Horton, and that he told Smallman to come to Florida to deliver money which Smallman owed to Velez. The district court further found that Velez was making a large part of the profit from the sale of the pills in Tennessee, and that he exercised decision-making authority over participants in the conspiracy, gave directions and orders, planned the activities of the conspiracy and supervised the participants.

The district court did not err in applying the §3B1.1(a) leadership role enhancement.

## V.  Conclusion

In accordance with the foregoing, the judgment entered and sentence imposed by the district court are affirmed.